UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------- ------------------x

UNITED STATES OF AMERICA                    :

       - v. -                               :

LAWRENCE DICRISTINA,                        :        **11-CR-414 (JBW)**

    Defendant.                              :

-----------------------------------------------------------------x


# DEFENDANT LAWRENCE DICRISTINA'S MOTION AND MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION TO DISMISS THE SUPERSEDING INDICTMENT


Kannan Sundaram
Attorney for Lawrence Dicristina

Federal Defenders of New York, Inc.
One Pierrepont Plaza
Brooklyn, New York 11241
Tel. (718) 330-1203

## PRELIMINARY STATEMENT

Defendant Lawrence Dicristina, by this motion and memorandum of law, hereby moves to dismiss the indictment as failing to allege a crime

## THE INDICTMENT

The government charges Lawrence Dicristina with the crimes of Conspiracy to Operate an Illegal Gambling Business in violation of 18 U.S.C. § 371, and Illegal Gambling in violation of 18 U.S.C. §1955(a).

The Illegal Gambling count alleges that, between December 2010 and May 2011, Mr. Dicristina and a co-defendant, Stefano Lombardo, together with others, conducted, financed, managed, supervised, directed and owned "an illegal gambling business, to wit:  a gambling business involving illegal card games" located at 3741B Victory Boulevard in Staten Island.

The conspiracy count, charging Mr. Dicristina with conspiring to commit the Illegal Gambling offense, alleges two overt acts, which occurred on or about February 17, 2011, at 3741B Victory Boulevard:  (1)  Mr. Lombardo "received cash from poker players in exchange for chips"; (2) Mr. Dicristina instructed the dealers to begin the poker game[.]"

## THE COURT'S POWER TO DISMISS THE INDICTMENT

Under Federal Rule of Criminal Procedure 12(b), "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial of the general issue." Fed. R. Crim. P. 12(b)(2).  The "general issue," as defined by the Second Circuit Court of Appeals, is "whether the defendant is guilty of the offense charged." *United States v. Doe*, 63

1

F.3d 121, 125 (2d Cir. 1995).  Hence, "[a] trial court may dismiss an indictment that does not

state an offense under the charged statute."  *United States v. Laurent*, 2011 WL 6004606 (Dec. 2,

2011) (Weinstein, J.); *see United States v. Aleynikov*, 737 F.Supp.2d 173, 176 (S.D.N.Y. 2010)

("Dismissal is required where the conduct alleged in the indictment as a factual basis for the

offense is not actually prohibited by the language of the statute"); *see generally United States v.

Mennuti*, 639 F.2d 107 (2d Cir. 1981) (upholding district court's pre-trial dismissal of indictment

because government's proposed proof would not establish a crime within the terms of the

statute).

## ARGUMENT

### A.  The Statutory Framework of the Illegal Gambling Business Act (18 U.S.C. §1955)

As this Court has noted in the context of a motion to dismiss under Rule 12(b),

"Sufficiency challenges often turn on the meaning of a statutory term."  *United States v. Laurent*,

2011 WL 6004606, at *32, citing *United States v. Perez,* 575 F.3d 164, 166 (2d Cir. 2009).  In

this case, defendant Lawrence Dicristina is charged with operating, and conspiring to operate, an

"illegal gambling business," specifically a business involving table poker games.  Thus, the

sufficiency of the indictment charging him turns on the meaning of the statutory term

"gambling."  If "gambling" does not include poker, then the indictment should be dismissed.  For

the reasons set forth below, it does not.

The substantive count and the conspiracy count charge Mr. Dicristina with violating the

Illegal Gambling Business Act ("IGBA"), 18 U.S.C. §1955, by conducting an illegal gambling

business involving poker games.  The IGBA provides, in relevant part, that "[w]hoever conducts, finances, manages, supervises, directs, or owns all or part on an illegal gambling business shall be fined under this title or imprisoned not more than five years, or both." 18 U.S.C. §1955(a).

The IGBA defines an "illegal gambling business" as "a gambling business" that violates state law, involves five or more persons, and has been in operation for 30 days or had gross revenue of $2,000 in any single day.  18 U.S.C. § 1955(b)(1).

"Gambling," under the IGBA, "includes but is not limited to pool-selling, bookmaking, maintaining slot machines, roulette wheels or dice tables, and conducting lotteries, policy, bolita or numbers games, or selling chances therein." 18 U.S.C. § 1955(b)(2).

Thus, the IGBA applies only to "illegal gambling business." There are a number of requirements the must be satisfied for a gambling business to be an "illegal gambling business" for the purpose of the IGBA. For the purposes of this motion, two are relevant.  First, the business must be a "gambling business," as determined by reference to the substance of that term under federal law.  Second, the business must be "a violation of the law of a State or political subdivision in which it is conducted." 18 U.S.C §1955(b)(1).

The principal limit on the statute's scope is the federal definition of "gambling" set forth in 18 U.S.C. §1955(b)(2).  A business cannot be a "gambling business" under IGBA unless it involves conduct falling within the scope of that definition, whether or not it is illegal under the relevant state law.  *See, e.g., United States v. Kaczowski*, 114 F. Supp. 2d 143, 152 (W.D.N.Y. 2000) (identifying definition of conduct as "gambling" as a separate element from illegality under state law);  *United States v. Hunter*, 478 F.2d 1019, 1021 n.2 (7th Cir. 1973) (Stevens, J.) (noting that appellants "concede that their activities *constituted 'gambling' as so defined, and*

3

that they were conducted in violation of the law of Indiana"); *see also Sanabria v. United States*, 437 U.S. 54, 70, 98 S. Ct. 2170, 2182 (1978) (holding that the "allowable unit of prosecution under § 1955" is participation in a "gambling business" which business must then violate state law).

Though the statutory text is thus clear on this point, the legislative history of the IGBA confirms that Congress intended "gambling" as defined under the" statute to be an element of the offense separate and apart from illegality under state law.  Senator Allott explained that the IGBA "defines an 'illegal gambling business' as one including such forms of betting as bookmaking or numbers *and* which first, is a violation of State law; second, involves five or more persons . . . ."  116 Cong. Rec. 603 (daily ed. Jan. 21, 1970) (statement of Sen. Allott) (emphasis added).

### B.   To Meet IGBA's Definition of "Gambling," Poker Would Have to Be Akin to the Specifically Listed Activities The Act Includes As Gambling

As set forth above, the IGBA's definition of gambling comprises a list of nine activities regarded by Congress as gambling, and poker -- despite its widespread familiarity and popularity at and well before the IGBA was enacted,  or perhaps because of it -- is not one of them.  In any event, because the statute's illustrative list of gambling games provides the only guidance on the question, it establishes a framework to determine whether a particular game constitutes "gambling" under IGBA.  As poker is not one of the specifically listed activities that constitute "gambling," the issue, then, is whether it is encompassed within the definition of "gambling" by resort to Section 1955(b)(2)'s "including but not limited to" clause.

4

In this regard, the Supreme Court instructs that when a statute includes an illustrative list of proscribed conduct, the reach of the statute is narrowly limited to activities that are either specifically listed or are similar to the enumerated activities. For example, in *Begay v. United States*, 553 U.S. 137 (2008), the Court considered whether DUI convictions that were considered "violent felonies" under state law were also "violent felonies" under the federal Armed Career Criminal Act, which provides enhanced penalties for unlawful firearm ownership by individuals with three violent felony convictions. The federal statute itself defined "violent felony" to include burglary, arson, extortion, or crimes involving the use of explosives.

The Supreme Court held that, notwithstanding the state law definition of "violent felony" to include DUI convictions, the federal definition of "violent felony" could extend only to crimes similar to the specifically enumerated crimes: "[W]e should read the examples as limiting the crimes . . . to crimes that are roughly similar, in kind as well as in degree of risk posed, to the examples themselves." *Id*. at 143. The *Begay* Court made clear that the illustrative list in the statute served a limiting purpose, not an expansive one: "If Congress . . . meant the statute to be all-encompassing, it is hard to see why it would have needed to include the examples at all." *Id*. at 142.

The Second Circuit similarly instructs that when interpreting a statute, "where general words are accompanied by a specific enumeration of persons or things, the general words should be limited to persons or things similar to those specifically enumerated." *City of New York v. Beretta U.S.A. Corp.*, 524 F.3d 384, 401 (2d Cir. 2008) (citation and internal quotation marks omitted); *see also United States v. Dauray*, 215 F.3d 257, 262 (2d Cir. 2000); *Molloy v. Metro. Transp. Auth.*, 94 F.3d 808, 812 (2d Cir. 1996) (adopting a "common sense approach to

interpreting a general provision in light of a list of specific illustrative provisions" so that the general term is construed to "include only things similar to the specific items in the list"); *Gen. Elec. Co. v. Occupational Safety and Health Review Comm'n*, 583 F.2d 61, 65 (2d Cir. 1978) ("The meaning of one term may be determined by reference to the terms it is associated with, and where specific words follow a general word, the specific words restrict application of the general term to things that are similar to those enumerated.").

Indeed, in *Molloy v. Metro*, the Court of Appeals applied that principle in interpreting a statutory provision which, like the IGBA provision at issue here, employed the phrase "including but not limited to." 94 F.3d 808, 812 (2d Cir. 1996) (with respect to statute defining "alteration" as "a change to an existing facility, including but not limited to" seven enumerated examples, Court held that only changes "similar to the specific items in the list" were required by the statute).

Such an approach is required even in cases where, as with gambling, the statutorily defined term is purportedly one of common understanding. *United States v. Parker*, 30 F.3d 542 (4th Cir. 1994), illustrates this point. In *Parker*, the defendant was convicted of possessing crack with intent to distribute within 1,000 feet of a "playground." *Id.* at 551 (citing 21 U.S.C. § 860(a)). The statute provided that a "playground" was "any outdoor facility (including parking lot appurtenant thereto) intended for recreation, open to the public, and with any portion thereof containing three or more separate apparatus intended for the recreation of children *including, but not limited to* sliding boards, swingsets, and teeterboards." *Id.* (citing 21 U.S.C. § 860(d)(1) (emphasis added)). The court reversed the conviction because the government failed to prove that the nearby park qualified under the statutory definition of playground despite its claim that

6

the park had two basketball nets and a "blacktop where kids could play hopscotch as well as other games." *Id.* at 552-53.  Cautioning against resorting to commonplace colloquial meanings of terms where Congress has provided an illustrative definition, the court held that the government was required to prove to the jury that there were three or more apparatuses in the park that were "akin to" the "sliding boards, swingsets, and teeterboards" identified in the statute. *Id.* at 553.  *See also United States v. Smith*, 13 F.3d 380, 382-83 (10th Cir. 1993) (reversing § 860(a) conviction because park containing grassy areas, walking paths, and gazebos did not contain three apparatuses as required by statute).

Just as in *Parker,* where the Court found that the alleged conduct must be "akin to" an illustrative list of items in a statutory definition, for poker to qualify as "gambling" under the IGBA, it must be similar to the specifically listed activities set forth in the IGBA.  This construction of the including but not limited to clause is supported as well by the related canon of *noscitur a sociis*, that "a word is known by the company it keeps."  *See, e.g., S.D. Warren Co. v. Maine Bd. of Env'tl Protection*, 547 U.S. 370, 378 (2006).  Under this principle, "a string of statutory terms raises the implication that the words grouped in a list should be given related meaning." *Id.* (internal citations and quotation marks omitted)

### C.  As Poker is Not Similar to the Enumerated Games Listed in the IGBA's Definition of "Gambling," Poker is Not Gambling Under the IGBA

Under this rule, poker cannot meet the statutory definition of "gambling" unless it is similar in kind to the nine enumerated games.  By any reasonable measure, it is not.

The nine gambling activities listed in (b)(2) are described below:

- *Pool-selling* is the selling or distribution of chances in a betting pool[8]—*i.e.*, "[a] gambling scheme in which numerous persons contribute stakes for betting on a particular event (such as a sporting event)."[9] Players cannot affect the game's outcome, so pool-selling is a game of chance.[10]

- *Bookmaking* is "[g]ambling that entails the taking and recording of bets on an event, such as a horse race."[11] Bookmaking is a game of chance, because the bettors have no way of affecting the outcome of events.[12] The bookmaker fixes the odds and the stakes, and bets against his customers.[13]

- *Slot machines* are coin-operated mechanical or electronic devices that pay off when random, individually selected symbols match one another on the machine's display. Otherwise, the bet goes to the house. Slots are house-banked, thus games of chance.[14]

- *Roulette* is a game in which players bet whether a ball, spun along a revolving wheel,

---

[8] Webster's New International Dictionary 1764 (3d ed. 1971).

[9] Black's Law Dictionary 1181 (8th ed. 2004).

[10] *See, e.g., Nat'l Football League v. Governor of State of Del.*, 435 F. Supp. 1372, 1385–86 (D. Del. 1977) ("chance rather than skill is dominant factor" in betting pool).

[11] Black's Law Dictionary 194 (8th ed. 2004).

[12] *See Bayer v. Johnson*, 349 N.W.2d 447, 449 (S.D. 1984) ("The outcome of . . . events [in a bookmaking scheme] in no way depends upon the skill of the bettors. The wagering is therefore a contest in which chance predominates over skill.").

[13] *See id.*

[14] *See, e.g., In re Indian Gaming Related Cases*, 331 F.3d 1094, 1104 & n.12 (9th Cir. 2003) (quoting K. Alexa Koening, *Gambling on Proposition 1A: The California Indian Self Reliance Amendment*, 36 U.S.F. L. Rev. 1033, 1041 n.65 (2002)) ("'Las Vegas-style slot machines offer "house-banked" games, which enable the house to collect players' losses.'"); *Brock v. Claridge Hotel & Casino*, 711 F. Supp. 779, 780 (D.N.J. 1989) (describing slot machines and blackjack as games of chance).

will land on a certain color or a certain number.  Players make their wagers against the house—hence roulette is a house-banked game—and the outcome is determined purely by the chance that the ball lands on the wagered number or color.[15]

- *Dice tables* are house-banked games in which players throw dice, usually in pairs, and make wagers against the house, based on the outcome of the throw, and thus they are also games of chance.[16]

- *Lotteries* are "[a] method of raising revenues, esp[ecially] state-government revenues, by selling tickets and giving prizes . . . to those who hold tickets with winning numbers that are drawn at random."[17]  Lottery participants cannot affect the outcome.[18]  Because the house keeps any bet that does not pay out, a lottery is a house-banked game.

- *Numbers* games are essentially lotteries.  In a numbers game, players wager that on a certain day, a chosen series of numbers will occur in some event to which the numbers game is pegged, for example, the payoff totals of a day's horse race.  The house guarantees the payoffs to any winners, and "[i]n such a game neither the number of winning players nor

---

[15] Merriam-Webster Online Dictionary, http://www.merriam-webster.com/dictionary/roulette (last visited Sept. 27, 2011) (Roulette is "a gambling game in which players bet on which compartment of a revolving wheel a small ball will come to rest in.").

[16] *See, e.g., Kansas City v. Caresio*, 447 S.W.2d 535, 537 (Mo. 1969) (finding that dice game was "game of chance" under local ordinances).

[17] Black's Law Dictionary 966 (8th ed. 2004).

[18] *See, e.g., Womack v. Comm'r of IRS*, 510 F.3d 1295, 1306 (11th Cir. 2007) (describing lottery as "game of chance"); *State ex rel. Kellogg v. Kan. Mercantile Ass'n*, 25 P. 984, 985 (Kan. 1891) (holding that plan for allocation of prizes "by chance" is a lottery).

the total amount of the payoffs can be predicted in any one day."[19]

- *Bolita* is a form of lottery "in which one attempts to guess a variably determined 2-digit number,"[20] sometimes derived by drawing numbered balls from a hopper,[21] or somehow tied to the results of the state lottery.  Because the numbers are "variably determined," bolita constitutes a game of chance.[22]  Bolita is a house-banked game because it is a form of lottery.

- *Policy* is similar to bolita or a numbers game, but differs in the method of determining the winning sequence or combination of digits.  "In policy, [the winning sequence] is ascertained by the drawing *at random* from a wheel in which tags, each bearing one of the possible combinations of numbers that can be played, have been placed."[23]  Policy is thus a game of chance[24] and a house-banked game.

Plainly, poker is qualitatively different from all of the enumerated games.  These games -- exemplified by classic "crap shoots" like roulette, lottery, and dice -- are based on sheer luck, and do not require or reward an ounce of skill.  They are all activities in which the bettor has no role in, or control over, the outcome.  Poker, on the other hand, is a game in which the outcome

---

[19] *United States v. Baker*, 364 F.2d 107, 112 (3d Cir. 1966).

[20] Webster's New International Dictionary 248 (3d ed. 1971).

[21] *See, e.g., United States v. Spino*, 345 F.2d 372, 373 (7th Cir. 1965).

[22] *See, e.g., Santos v. United States*, 461 F.3d 886, 888 (7th Cir. 2006) (describing "bolita" as lottery), *aff'd*, 553 U.S. 507, 128 S. Ct. 2020 (2008); *United States v. Febus*, 218 F.3d 784, 788 (7th Cir. 2000) (same); *Ex parte Alvarez*, 94 So. 155, 155 (Fla. 1922) (describing bolita as "game of chance").

[23] *Baker*, 364 F.3d at 112 (emphasis added).

[24] *See, e.g., Forte v. United States*, 83 F.2d 612, 615-16 (D.C. Cir. 1936) (noting that "policy game is undoubtedly a lottery," defined by D.C. Code as game of chance).

depends to at least some degree on the skill and decisions of the bettors.  *See* Anthony Cabot and

Robert Hannum, *"Poker:  Public Policy, Law, Mathematics, and the Future of an American*

*Tradition,"* 22 T.M. Cooley L. Rev. 443, 445 (2005)  ("poker differs in substantial respect from

lotteries and most casino-style games because poker has various elements of skill not present in

lotteries and casino games").  The players compete against each other on a level playing field,

using an array of talents and skill, to prevail over their opponents.

Of course, given that the cards are distributed randomly, there is some accumulation of

luck over the course of a poker match that will affect how individual players perform.  But that is

also true, for example, of golf, where "changes in the weather may produce harder greens and

more head winds for the tournament leader than for his closest pursuers.  A lucky bounce may

save a shot or two."  *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 687 (2001).  But as is true for

similar games like golf, billiards, and bridge, when good poker players play against bad ones, the

good players consistently and routinely prevail.  *See* Cabot and Hannum, *id.* at 465 ("serious and

skilled poker players tend to win consistently, while those relying on luck do not"), and 465-67,

479-83 (discussing studies showing the dominance of skilled poker players over unskilled

players).

In stark contrast, there is simply no such thing as a "good" roulette or lottery player, just a

lucky one.  Poker is a dramatically different species of game than the completely luck-driven list

of activities this statute defines as "gambling."  *See id.* ("If you ask who are the top five poker

players in the world, you will receive a meaningful response because skill is a determining factor.

But if you ask who are the top five roulette players in the world, the response is utterly meaningless:  roulette is purely a game of chance").

Second, the enumerated games are all lottery or house-banked games in which the house plays against its customers.  Poker, unlike the listed activities, is not house-banked -- the house does not stake its own money in the game, but instead merely collects a fee, or "rake," for hosting the game.  *See* Cabot and Hannum, *id.* at 452-53.[25]

The definition of games falling within the scope of the IGBA's definition of "gambling" is plainly non-exclusive, which serves the needs of the statute given that the names and particular rules of games can and do evolve over time.  As such, a non-exclusive definition is necessary to ensure that the the Act covers both the games listed when the statute was enacted, but also the variants of those games that might arise in the future.  Poker did not evolve from any of the listed games and was already widely popular when the IGBA was enacted in 1970.

---

[25] The distinction between banked games and non-banked games like poker is already well-established in federal gambling law.  The Indian Gaming Regulatory Act, 25 U.S.C. § 2701 *et seq.* (enacted in 1988), for example, defines three classes of gaming, each subject to different levels of regulation.  The least regulated are "class I" games, which include "social games solely for prizes of minimal value or traditional forms of Indian gaming engaged in by individuals as a part of, or in connection with, tribal ceremonies or celebrations." 25 U.S.C. § 2703(6).  Poker falls within the definition of "class II gaming," which includes bingo and card games, but specifically does not include "any banking card games, including baccarat, chemin de fer, or blackjack (21)." *Id.* § 2703(7).  Those banking card games fall instead within the definition of "class III gaming," which also includes slot machines, craps tables, and any other game not defined as class I or class II gaming. *Id.* § 2703(8).  Although the Indian Regulatory Gaming Act does not control this case, it is relevant that, when defining classes of gaming, Congress placed poker in a different class altogether from traditional casino gambling.  If Congress intended to treat poker like slot machines and banked games under IGBA, it could have included poker as one of the statute's enumerated games or list it on a schedule (as it does, for example, under the Controlled Substances Act).  Notably, IRGA distinguishes among games for treatment under that federal law.  As discussed in this memorandum, if Congress' failure to list poker was not intentional, because Congress did not see peer-to-peer poker as warranting federal prosecution, then applying IGBA to such activity raises serious constitutional concerns.

Given these significant differences, this Court should not read the IGBA's definition of "gambling" to encompass poker. To give the language of (b)(2) substantive effect, while still attributing meaning to the phrase "includes but is not limited to," the definition must be interpreted as a non-exclusive list of types of "gambling" that share certain important, defining, and limiting characteristics.

A contrary result would render Congress's definition effectively irrelevant. *See United States v. Menasche*, 348 U.S. 528, 538-39, 75 S. Ct. 513, 520 (1955) ("It is our duty to give effect, if possible, to every clause and word of a statute.") (internal citations and quotation marks omitted). If the government can prosecute poker as "gambling" under the IGBA, despite the fact that poker is so materially different from every one of the games enumerated in the statutory definition, then the listed games provide no meaning—and impose no discernible limit on government enforcement -- for individuals trying to engage in lawful conduct. In short, because poker is substantially different from the games listed in IGBA, it is not "gambling" under the statute.[26]

Accordingly, the indictment against Mr. Dicristina, even accepting its factual allegations as true, does not state an offense under the charged statute. Therefore, the indictment must be dismissed. *See United States v. Aleynikov*, 737 F.Supp.2d 173, 176 (S.D.N.Y. 2010); *see also United States v. Mennuti*, 639 F.2d 107 (2d Cir. 1981) (upholding district court's pre-trial dismissal

---

[26] Previous prosecutions brought under IGBA that involve poker are not to the contrary; in many cases the gambling businesses offered house-banked games of chance, too, or video poker machines, which are entirely different from true peer-to-peer poker games. *See, e.g., United States v. Cook*, 922 F.2d 1026 (2d Cir. 1991) (involving slot machines, blackjack, roulette and craps in addition to poker); *United States v. Giovanetti*, 919 F.2d 1223, 1225 (7th Cir. 1990) (sports betting, blackjack, craps and poker); *United States v. Conley*, 859 F. Supp. 909 (W.D. Pa. 1994) (video poker machines); *United States v. Grey*, 56 F.3d 1219 (10th Cir. 1995) (video poker

of indictment because government's proposed proof would not establish a crime within the terms of the statute).

### D. Under The Rule of Lenity, Any Uncertainty Regarding the Scope of the IGBA Must Be Resolved in Mr. Dicristina's Favor

Under the rule of lenity, unless online poker is unambiguously covered by the terms of the IGBA, Mr. Dicristina's conduct should not be deemed unlawful.  The Supreme Court has directed that "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *United States v. Bass*, 404 U.S. 336, 347 (1971) (internal citation and quotation marks omitted).  "This policy embodies the instinctive distaste against men languishing in prison unless the lawmaker has clearly said they should." *Id.* at 348 (internal quotation marks omitted); *see also United States v. Lanier*, 520 U.S. 259, 266 (1997) ("[T]he canon of strict construction of criminal statutes, or rule of lenity, ensures fair warning by [] resolving ambiguity in a criminal statute as to apply it only to conduct clearly covered"); *Bell v. United States*, 349 U.S. 81, 83 (1955) ("It may fairly be said to be a presupposition of our law to resolve doubts in the enforcement of a penal code against the imposition of a harsher punishment.").[27]

Applying the basic principle of lenity to this case, the prosecution of Mr. Dichristina for a violation of the IGBA must fail.  The IGBA does not contain the requisite clear statement that poker is covered by its terms.  Under the IGBA, a business conducting poker games can be an illegal gambling business only if poker is considered "gambling."  Not only does the IGBA fail to list poker among the enumerated "gambling" games, it does not define "gambling" beyond listing nine house-banked games of pure chance.  The rule of lenity requires the Court to adopt the most defendant-

---

[27] The rule of lenity is especially appropriate in construing statutes that, like the IGBA, constitute predicate offenses for the money laundering statute. *See Skilling v. United States*, 130 S. Ct. 2896, 2932-22 (2010).

14

friendly interpretation of the statute and thereby read it to exclude poker.

The Supreme Court's recent decision in *United States v. Santos*, 553 U.S. 507, 513-15 (2008), is instructive. In *Santos*, the Court applied the rule of lenity in affirming the lower courts' decision vacating money laundering convictions premised on the statutory term "proceeds," which Congress did not define. The Court recognized that the term could mean either of two different things, but that "the tie must go to the defendant." *Id.* at 514. Under the rule of lenity and the Supreme Court's reasoning in *Santos*, this Court should adopt the defendant-friendly reading of the IGBA and find that the statute does not cover the conduct charged in this case. For thsi reason, as well, the indictment should be dismissed.

## CONCLUSION

For the foregoing reasons, Mr. Dichristina respectfully requests that the Court dismiss both counts of the Indictment against him, and grant any such further relief as the Court may deem just and proper.

Dated: June 29, 2012
       Brooklyn, New York