## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

LAWRENCE DICRISTINA and
STEFANO LOMBARDO,
     Also known as "Mitzie,"

             Defendants

MEMORANDUM OF LAW OF *AMICUS CURIAE* THE POKER PLAYERS ALLIANCE IN SUPPORT OF DEFENDANT LAWRENCE DICRISTINA'S MOTION TO DISMISS SUPERSEDING INDICTMENT

No. 11-CR-414 (JBW)

The Poker Players Alliance ("PPA") submits this memorandum as *amicus curiae* in the above-captioned matter.[1] This memorandum describes the nature and history of poker and explains why poker does not constitute gambling under the Illegal Gambling Business Act ("IGBA"), 18 U.S.C. § 1955, and New York Penal Law § 225.00.[2]

### INTEREST OF THE AMICUS

The Poker Players Alliance is a nonprofit membership organization comprising over one million poker players and enthusiasts from around the United States. The PPA's mission is to defend the rights of poker players and to ensure that poker—a game of skill and one of America's oldest recreational activities—remains free from unnecessary and misguided intervention. To that end, the PPA engages in advocacy and outreach efforts to ensure that poker

---

[1] Counsel for the PPA certifies that no party to this case paid for the preparation of this brief, nor authored it.

[2] The PPA understands that it is undisputed that the allegations of illegal gambling contained in the indictment pertain to poker, as indicated by the reference to poker in the overt acts. (*See* Indictment ¶ 2(a)-(b)).

players have a secure, safe, and regulated place to play. The PPA has participated as an amicus in multiple cases concerning the legality of poker.

## FACTUAL BACKGROUND

Before describing the unique features of poker that establish its legality, it makes sense briefly to set forth the basic premises, terminology, and rules of poker games.[3] The Court can take judicial notice of these facts; they are "not subject to reasonable dispute" because they are both "generally known within the territorial jurisdiction of the trial court," and "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).

Poker is a vying game played using standard playing cards and "chips," which are tokens that typically represent money. Poker games are played as a series of "hands," each of which is a contest for a "pot" of chips to which the players contribute.[4] At the start of each hand, some or all of the players pay a small number of chips—known either as an "ante" or a "blind"—into the pot. Antes and blinds are small, *i.e.*, the minimum size bet permitted in a given game. These bets function as a seed contribution to the pot; their presence creates an incentive for players to participate in the hand. Antes and blinds are the only bets that any player is forced to make, and every player must pay them, either because the rules require every player to post an ante every

---

[3] The word "poker" does not refer to a single game, but rather to a family of games that share certain essential traits. The rules and characteristics of poker described in this brief are common to all poker games.

[4] The word "hand" is commonly used to refer both to the contest for an individual pot—*e.g.*, "He won the hand," and to a particular player's holdings—*e.g.*, "I have a strong hand." For the sake of clarity, this brief will use the word "hand" to refer only to the former, and will use the word "holding" to refer to an individual player's cards. However, some of the cited authorities may not follow this convention.

hand, or because every hand the obligation to pay the blinds rotates to a new set of players so that all players eventually must pay them.

Once the antes or blinds are posted, the players receive cards, and "rounds" of betting occur, during which players make strategic moves designed to influence the size of the pot, the number of players competing for the pot, and their likelihood of winning the pot.[5] Each poker hand involves one or more betting rounds—typically a maximum of four or five. After each round (except the final one), the players receive additional cards, which alter the composition, and therefore potentially alter the strength, of their holdings.

During betting rounds, the players act in sequence, and must choose which of the available moves to make. If nobody has bet, then the player whose turn it is to act has two options: he may either "check," which means that he chooses not to act, allowing the next player to act; or he can "bet," which means that he wishes to contribute some chips to the pot. The act of betting obliges the other players to at least match the size of the bet if they wish to stay in the hand and retain the ability to win the pot. Once a player has bet, the next player has three options: he can "fold," which means that instead of matching the bet, he discards his cards and forgoes any ability to win the pot; he can "call," which means that he matches the amount of the previous bet exactly; or he can "raise," which means that he augments the size of the bet, and thus imposes an obligation on all of his opponents to call *his* bet in order to remain in the hand.

---

[5] Poker holdings are ranked according to a fixed system. The highest possible holding is a straight flush (five cards of the same suit, in sequential rank order—the highest straight flush is known as a "royal flush"), followed in turn by four of a kind (four cards of the same rank, *e.g.*, four aces), a full house (three cards of one rank and two of another), a flush (five cards of a suit), a straight (five cards in sequential rank), three of a kind, two pairs, one pair, and then highest individual card. In most games, the highest combination wins the pot. In some games, however, the lowest wins the pot, or the highest and lowest split the pot. Regardless, the cards are only revealed and compared if more than one player stays in the hand through every round of betting—a situation known as a "showdown," which is rare because typically one player bets and induces all of his opponents to fold.

A round of betting ends when either all of the players have called the largest bet, or one player has, by betting, induced all of his opponents to fold. In the latter scenario, the hand ends as well, and the remaining player wins the pot.

The players' decisions are independent of their cards. A player with the strongest holding need not bet, and a player with the weakest holding need not fold. Similarly, no player can be forced to call a bet, or to fold in the face of a bet. And the amounts that players bet are likewise not controlled by the cards they hold. Thus, two players could compete for a very large pot even though both have relatively weak holdings, just as  two players could compete for a very small pot even if both have very strong holdings—the size of the pot is a function of what the players decide to bet, and of those decisions alone.

A player can win a hand in one of two ways. First, as noted above, he can induce all of his opponents to fold by making a bet that they are unwilling to call. In this manner, a player can win the hand even without holding the strongest cards (or without believing he holds the strongest cards). Attempting to win without the best cards is referred to as "bluffing," and it is an essential feature of the game. Second, if more than one player stays in a hand through all of the betting rounds, then those players reveal their cards in a "showdown," and the player with the best holding takes the pot. Once a hand ends, another hand begins immediately, with the obligation to pay the blinds typically rotating around the table.

Poker games can take one of two forms. In a "ring game," the chips have cash value, and can be redeemed with the operator of the game. Players can enter and exit the game at their leisure, taking their chips with them. In a tournament, by contrast, players pay an entry fee, and these fees compose the prize pool. At the start of the tournament, each player receives the same number of tournament chips, which do not have any cash value. Players play hands until they run

out of chips, at which point they are eliminated from the competition. Play continues until only one player remains—that player is the winner of the tournament, but typically many players receive prizes commensurate with how long they last in the tournament.

Regardless of the variant of poker, or the form of the game, the object of the game is for each player to take chips from the other players, resulting in a monetary gain—in ring games, the gain occurs when the chips are redeemed for value, and in tournaments, the gain occurs when the player is eliminated, and paid in accordance with his overall standing in the competition. Thus, a ring game player's success in poker is measured not by how many hands he wins, but by the total number of dollars he has once the pots he wins are netted against his contributions to the pots he loses. For a tournament player, success is measured by subtracting the entry fee he pays from the tournament prizes he wins. In other words, poker players seek to maximize their profits.

## ARGUMENT

Poker is different from games traditionally regarded as gambling in several key respects. As a result, it does not fall within the statutory definitions of "gambling" set forth in the IGBA or the New York Penal Law.

## I.    Poker Is Qualitatively Different from Games Traditionally Regarded as Gambling.

For three reasons, poker is qualitatively different from games traditionally regarded as gambling. First, unlike gambling games, poker is not house-banked. Poker players compete against each other, and not against the casino or house. Second, in poker, the players have a high degree of control over the outcome of the game. Unlike, for example, roulette, slot machines, lotteries, or sports betting, in which players have no control over whether they win or lose, poker players have the ability to dramatically and directly influence the outcome of the game. Finally, poker has a long and celebrated history in the United States. For centuries, everybody from

Presidents to Supreme Court Justices to common citizens has enjoyed the game of poker. These distinctions, individually and together, establish that absent some specific evidence of a contrary legislative intent, poker should not be understood as gambling.

## A. Poker Is Not a House-Banked Game.

Unlike a casino or a bookmaker, the operator of a poker room does not make money by playing against its customers. Instead, the operators earn their money by taking a fee for hosting the game, often, but not always, collected as a small percentage of each pot, known as a "rake." Tournament buy-ins typically include two parts: a buy-in, which goes into the prize pool, and an entry fee, which compensates the house for hosting the game. Thus, in both ring games and tournaments, a poker room operator's revenues are not contingent in any way on the outcome of the game.

This is in contrast with casinos and bookmakers, which make money by beating their customers. Because these individuals and organizations have an adversarial relationship with their customers, they invariably retain an advantage for their side of the wagers. Thus, in the long run, the customers invariably lose against casinos—or, as the saying goes, "the house always wins." The same is not true of poker. In poker, the rules and odds afford each player an equal opportunity to win, and over the long run, more skillful players can and do win significant sums.

A poker room operator's incentives are also different from a casino's. Unlike a poker room operator, the casino seeks to beat its customers rather than merely provide them with exceptional service. An honest poker room operator has no incentive or opportunity to manipulate odds the way that a bookmaker does, or to mislead his customers about the nature of

the game, as a casino does.[6] Instead, the poker room operator's incentive is to provide the fairest game and the most comfortable setting for its customers. It is their continued use of the room's services, rather than the results of the game, that generates profits for the operator.

The distinction between house-banked and peer-to-peer games is recognized in federal law. For example, the Indian Gaming Regulatory Act provides that house-banked card games are always "class III" games, 25 U.S.C. § 2703(7)(B)(i), and thus subject to the strictest regulation, while other card games (including poker) can be "class II" games if they meet other relevant conditions, *see* 25 U.S.C. § 2703(7)(A)(ii). State gambling statutes likewise differentiate between house-banked and non-house-banked games. *See* Cal. Penal C. § 330 (prohibiting "any banking . . . game played with cards, dice, or any device"); Fla. Stat. Ann. § 849.086(1), (12) (prohibiting cardrooms from offering "any banking game"); Mont. Code Ann. § 23-5-311(1) (authorizing "bridge, cribbage, hearts, panguingue, pinochle, pitch, poker, rummy, solo, and whist," but no house-banked card games); Ind. C. Ann. § 4-32.2-2-12 (permitting approved card games for charity game nights, but not permitting, *inter alia*, bookmaking, slots, policy, numbers, or house-banked card games); Okla. Stat. Ann. tit. 3A §§ 262(H), 281(19) (authorizing tribal gaming, but not permitting house-banked card games).

## B. Poker Is a Game of Skill.

---

[6] *See Commentary On The Law Of Poker*, 8 Rich. J. Global L. & Bus. 11, 12 (2008) ("It would seem so logical . . . to distinguish games of skill from games of chance. The games of chance are played against the house and the games of skill are played against people around the table. . . . What I hear [some] saying is, beware of the machines, beware of the slots, and beware of this video, audio, visual, musical industry that has as its objective the addiction of the people to poke the button until their wallets are empty. That does not describe poker.") (quoting Prof. Charles Nesson, Harvard Law School). Of course, this is not to suggest that bookmakers and casino operators are universally dishonest, or that poker room operators are universally upstanding—but it does demonstrate why Congress would sensibly have made the judgment that casino and bookmaking operations present greater risks to customers than poker rooms.

Poker is a game in which skill predominantly determines the outcome. In poker the players compete against each other on a level playing field, and use an array of talents to influence and indeed control the outcome of the game. Although the deal of the cards is a chance element within the game, it only rarely determines the outcome of a hand, and does not determine the outcome of the game over the long run.

This conclusion finds support in both an analysis of the rules of the game and an analysis of the data regarding poker.[7] Not only do the rules afford all players an equal opportunity to win, but they also provide the players with tools (*i.e.*, bluffing and folding) that enable the players to determine the outcome of the game. By bluffing, a more skilled player can win a hand even with a weak holding, and thus gain chips on the basis of his skill alone. By folding, a more skilled player can escape from a losing hand without committing a significant number of chips, thereby minimizing his losses and increasing his profits. Thus, in order to prevail in poker, players need not "get lucky" the way that they must in casino games. In poker, unlike casino games, the players can exercise their skills not only to play the odds, but to alter the odds in their favor.

The data regarding poker overwhelmingly demonstrate that skill, and not chance, determines who succeeds at the game.[8] Indeed, the skill level in poker has been compared

---

[7] This Court can take notice of these facts. *See Neeld v. Nat'l Hockey League*, 594 F.2d 1297 (9th Cir. 1979) (taking judicial notice of the fact that hockey is a rough physical contact sport); *Seminole Tribe of Florida v. Butterworth*, 491 F.Supp. 1015 (S.D. Fla. 1980) (taking judicial notice that bingo was largely a senior citizen pastime); *Driebel v. City of Milwaukee*, 298 F.3d 622 (7th Cir. 2002) (taking judicial notice of a police department's rules manual).

[8] Statistical analyses of large samples of poker hands demonstrate that the vast majority of poker hands are settled without a showdown, and so the players' cards are never even revealed. This data shows empirically that poker results depend on the players' choices and decisions, not on the cards they are dealt. *See, e.g.*, Paco Hope & Sean McCulloch, *Statistical Analysis of Texas Hold 'Em* 5 (2009) (attached as Exhibit A) (considering more than 100 million online poker hands and concluding that 76 percent of hands are resolved without the cards being revealed, and that half of the remaining hands were won by the player who did not hold the best cards because the player with the best cards had folded before the conclusion of the hand). Mathematical

favorably with that in tennis, golf, baseball, and investment advising—all commonly regarded as being dominated by skill despite the role of chance.[9] In contrast with the litany of studies concluding that skill plays a dominant role in poker, the PPA has seen *no* studies concluding that poker is a game in which chance predominates over skill over any meaningful period of time.

There is a great deal more that can be said about the role of skill in poker, but at this stage, it is sufficient for the Court to acknowledge a point that the Government cannot sincerely dispute: in poker, the players can—and do—exercise their skills to alter the outcome of the game, in a way that is not possible in traditional casino games.

### C. Poker Has a Long and Celebrated History in American Culture.

Poker is also different from other gambling games because it is an American tradition. As early as 1875, the New York Times editorial page opined that "the national game is not baseball, but poker." "The National Game," *The New York Times*, Feb. 2, 1875, *available at* http://tinyurl.com/3kwtdom. And the popularity of poker has only grown. As many as 55 million Americans play the game today. *See* Poker Players Alliance, Poker Facts, http://theppa.org/resources/facts/ (last visited June 27, 2012). Poker enthusiasts have included U.S. Presidents, Members of Congress, and Supreme Court Justices. *See generally* James

---

models of poker likewise demonstrate that over a series of hands a skilled player's advantage over an unskilled player is "overwhelming," such that poker is "almost entirely a game of skill." Noga Alon, *Poker, Chance, and Skill* 15 (2006) (attached as Exhibit B) (concluding that across 90 hands, the probability that an unskilled player will do better than a skilled one is approximately .187 percent, and over 140 hands, the number drops to .016 percent).

[9] *See* Alon, *Poker, Chance, & Skill* 15 (2006) (arguing that in poker "the influence of [chance] is not necessarily larger, and in fact appears to be smaller, than the influence of chance elements in tennis"); Rachel Croson, Peter Fishman & Devin G. Pope, *Poker Superstars: Skill or Luck?*, 21 Chance, no.4, at 25, 28 (2008) (Attached as Exhibit C) (comparing poker to golf); Steven D. Levitt & Thomas J. Miles, *The Role of Skill Versus Luck In Poker: Evidence From the World Series of Poker*, NBER Working Paper 17023 (May 2011) (attached as Exhibit D) (comparing poker to major league baseball and investment advising).

McManus, Cowboys Full: The Story of Poker (2010) (describing the poker proclivities of presidents including Ulysses Grant, Harry Truman, Franklin Roosevelt, and Barack Obama, among others); "Harvard Ponders Just What It Takes To Excel at Poker," *The Wall Street Journal*, May 3, 2007 (noting that Justice Scalia plays in a regular poker game). Indeed, Richard Nixon, who signed the IGBA into law in 1970, "played poker every free occasion" while in the military, and is reported to have financed his first congressional campaign with poker winnings. *See* Conrad Black, Richard M. Nixon: A Life in Full 61 (2007); Christopher Matthews, Kennedy & Nixon 156 (1998). Moreover, movies and books about poker are ubiquitous, and poker terms such as "calling a bluff," "raising the stakes," "going all in" and "sweetening the pot" are fixtures in the popular vernacular.

## II.     Poker Is Not "Gambling" Under the IGBA.

Poker does not constitute gambling under the IGBA, 18 U.S.C. § 1955. The IGBA's definition of "gambling" includes a list of nine games,[10] but that list does not mention poker, and poker does not resemble the enumerated games in key respects. Because poker is different in kind from the games that Congress enumerated as "gambling," this Court should hold that it does not fall within the statutory definition of the term.

The IGBA's definition of "gambling" provides that the term "includes, but is not limited to" nine enumerated games. 18 U.S.C. § 1955(b)(2). When Congress uses the word "includes" in a definition, it is invoking the canon of "*ejusdem generis*," which means "of the same kind." *Holley v. Lavine*, 553 F.2d 845, 851 (2d Cir. 1977). This canon provides that "where general words are accompanied by a specific enumeration of persons or things, the general words should

---

[10] The enumerated games are "pool-selling, bookmaking, maintaining slot machines, roulette wheels or dice tables, and conducting lotteries, policy, bolita or numbers games, or selling chances therein." 18 U.S.C. § 1955(b)(2).

be limited to persons or things similar to those specifically enumerated." *City of New York v. Beretta U.S.A. Corp.*, 524 F.3d 384, 401 (2d Cir. 2008) (internal quotation marks omitted). Thus, a game cannot be gambling if it is not similar to the enumerated games.

Under this standard, poker does not fall within the IGBA's definition of gambling. Unlike the listed "gambling" games, poker is not a house-banked or lottery game. Furthermore, unlike the enumerated games, poker is not a game in which chance determines the outcome. As defendant's motion to dismiss explains, the nine enumerated activities all share these traits.  See Defendant's Motion at 7-10.

Poker is qualitatively different from these games. First, as noted in Part II(A), poker is not a house-banked game, but is instead a peer-to-peer game in which the players compete against each other on a level playing field, and the house acts only in the role of a host for the game—not as a participant. Second, as noted in Part II(B), poker involves a sufficient degree of skill that it is different in kind from the games enumerated in the IGBA's definition of gambling. The enumerated games all require the players to play the odds and get lucky in order to win. Poker imposes no such burden on its players—rather, the players have the ability to alter the outcome of individual hands, and to maximize their long-term profitability through skillful play. Finally, as noted in Part II(C), poker has a long and celebrated history in American society that makes it highly unlikely that Congress intended to ban it. In light of the widespread popularity of poker and of its prominence in American culture, it simply defies reason to assume that Congress would have banned the game without ever mentioning it.

The legislative history confirms this reading of the text. The IGBA was enacted as part of the Organized Crime Control Act of 1970 in an effort to deprive criminal enterprises of gambling income, which President Nixon described as "the life line of organized crime." *Measures*

*Relating to Organized Crime: Hearings Before the Subcomm. on Crim. Laws & Procedures of the S. Comm. on the Judiciary*, 91st Cong. 449 (1969) (Message from the President of the United States Relative to the Fight Against Organized Crime) (hereinafter "*Senate Judiciary Hearings*"). The Act provided the Department of Justice with new tools to combat organized crime, including the Racketeer Influenced and Corrupt Organizations Act (Title IX). Title VIII of the Act targeted syndicated gambling and included two parts, the first of which made it a crime to conspire to obstruct local investigations of illegal gambling operations, *see* 18 U.S.C. § 1511, and the second of which became the IGBA.

The IGBA's principal target was numbers rackets. These were intrastate lotteries—operated by organized crime groups—that offered lopsided odds and thus leached significant sums from poor communities. In his message to Congress on Organized Crime, the President singled out "the numbers racket" as a particularly important and pernicious form of gambling. *See Senate Judiciary Hearings* 444 (Message from the President of the United States Relative to the Fight Against Organized Crime). The Attorney General did the same in his remarks to the Senate. *See id*. at 108 (statement of John N. Mitchell). And Senators and other witnesses noted that "[t]he greatest single source of revenue for organized crime is its gambling activities, which net an estimated seven (7) to fifty (50) billion dollars a year . . . . A great portion of this is gained through numbers rackets, draining from the poorest inhabitants of our ghettos and slums and their families precious dollars which should be spent for food, shelter and clothing." *Id*. at 158 (Statement of Sen. Tydings); *see also Organized Crime Control: Hearings Before Subcomm. No. 5 of the H. Comm. on the Judiciary*, 91st Cong. 87 (1970) (Statement of Sen. McClellan) (hereinafter "*House Judiciary Hearings*") (expressing concern over the effect of the stilted odds

in numbers and its contribution to organized crime revenues); *id.* at 400 (Statement of Vincent L.

Broderick, Chairman N.Y. Cnty. Lawyers Ass'n) (similar statement to Senator McClellan's).

Even though numbers rackets clearly implicated the federal interest in eradicating

organized crime, they had been difficult to prosecute because many did not involve interstate

conduct. *See Senate Judiciary Hearings* 383 (Statement of Will Wilson) ("Very few numbers

operations have been prosecuted at a Federal level because very seldom are state lines crossed . .

. ."). Through a congressional finding that large-scale gambling operations affect interstate

commerce, the IGBA enabled prosecution of intrastate numbers rackets. William Hundley, who

had served for seven years as the head of the Organized Crime and Racketeering Section at the

Department of Justice, testified that:

> [P]robably the *only* area where [the IGBA] would be helpful would be in getting
> at big numbers rackets, because in my experience in the Justice Department any
> gambling operation that was worth Federal concern had an interstate aspect, and
> that you could proceed under 1953 and the other bills. But some of the really big
> numbers operations, particularly in a place like New York, can be, by the nature
> of the operation, self-contained . . . and you could use this new [statute] against
> those. *I don't see that it would be really of much use otherwise in the gambling
> area.*

*Senate Judiciary Hearings* 425 (Statement of William Hundley) (emphasis added).

Of course, syndicated gambling was broader than numbers, and the IGBA was therefore

broader as well. But the sponsors of the statute were concerned not with all activities that one

might conceivably describe as gambling, but rather with games that generated revenue for

organized crime and permitted it to flourish. They identified, in addition to numbers, betting on

horse racing, sporting events, lotteries, dice games, and illegal casinos as important forms of

syndicated gambling. *See* 116 Cong. Rec. 590 (1970) (statement of Sen. McClellan); *see also*

President's Commission on Law Enforcement & Administration of Justice, *The Challenge of

Crime in a Free Society* 188 (1967) (noting that organized criminals offered a range of games

from "lotteries, such as 'numbers' or 'bolita,' to off-track horse betting, bets on sporting events, large dice games and illegal casinos.").[11] Congress recognized that "[t]he directors and managers of the major numbers, booking, and sports gambling operations across the country are, of course, the same Mafia leaders who engage in extortion, labor racketeering, corruption of legitimate business, and the panoply of other illegitimate enterprises which support organized crime," and so targeted them for enforcement. *House Judiciary Hearings* 105 (Statement of Sen. McClellan). Ultimately, the list of games that Congress used to define gambling, which includes "poolselling, bookmaking, maintaining slot machines, roulette wheels or dice tables, and conducting lotteries, policy, bolita or numbers games, or selling chances therein," 18 U.S.C. § 1955(b)(2), contains games that all generated significant revenues for organized crime. No sponsor of the bill or official in the Department of Justice referred to poker games as a target for IGBA enforcement. Congressional intent was to halt the flow of revenues from illegal gambling activities that were understood to finance organized crime, and that was all.

To the extent that the IGBA's definition of "gambling" is ambiguous on this point, this Court should resolve the ambiguity by applying the rule of lenity, which requires that criminal statutes be strictly construed. The rule of lenity serves two purposes. First, it ensures that "statutes . . . serve as a 'fair warning . . . in language that the common world will understand.'" *United States v. Canales*, 91 F.3d 363, 368 (2d Cir. 1996) (quoting *Babbitt v. Sweet Home Chapter*, 515 U.S. 687, 704 n.18 (1995)). Second, it gives force to the principle that "legislatures and not courts should define criminal activity." *United States v. Bass*, 404 U.S. 336, 350 (1971). The term "gambling," as defined in the IGBA, does not clearly encompass poker. Because poker

---

[11] Citations to the President's Commission's 1967 report were ubiquitous in the record. For example, at the start of the House Judiciary Hearings, the Chairman began by reading a quote from the report describing the harms of organized crime. *See House Judiciary Hearings* 77 (Remarks of Chairman Emanuel Celler).

is qualitatively different from the enumerated games, and because the definition includes no guiding principle that would enable a person of ordinary intellect to conclude that poker falls within the definition, this Court should hold that the IGBA does not regard poker as "gambling."

### III.    Poker Is Not "Gambling" Under New York Penal Law § 225.00.

Poker also does not fall within the New York definition of gambling. The New York Penal Law defines gambling as follows:

> A person engages in gambling when he stakes or risks something of value upon the outcome of a contest of chance or a future contingent event not under his control or influence, upon an agreement or understanding that he will receive something of value in the event of a certain outcome.

N.Y. Penal Law § 225.00(2). A "contest of chance," in turn, is "any contest, game, gaming scheme or gaming device in which the outcome depends in a material degree upon an element of chance, notwithstanding that skill of the contestants may also be a factor therein." *Id*. § 225.00(1).

The Practice Commentary from Donnino to NY Penal Code § 225.00 (quoting Denzer and McQuillan, Practice Commentary, McKinney's Penal Law § 225.00, pp. 23 (1967)) explains that under this definition, when the participants in a game of skill wager on the outcome of that game, that act does not constitute gambling:

> One illustration of the definition of "gambling," drawn from the commentaries of Judges Denzer and McQuillan, is the chess game between A and B, with A and B betting against each other and X and Y making a side bet. Despite chess being a game of skill, X and Y are "gambling" because the outcome depends upon a future contingent event that neither has any control or influence over. The same is not true of A and B, who are pitting their skills against each other and thereby, have a material influence over the outcome; they, therefore, are not "gambling."

As discussed in subpart II(B), *supra*, poker constitutes a game of skill under this analysis because, as in chess, the players "have a material influence over the outcome" of the game.[12]

To determine whether a game is one of skill or not, New York law looks to whether skill predominates over chance in determining the outcome. Recently, the criminal court in *People v. Li Ai Hua*, 885 N.Y.S.2d 380 (N.Y. City Crim. Ct. 2009), laid out the test:

> [W]hile some games may involve both an element of skill and chance, if "the outcome depends in a material degree upon an element of chance," the game will be deemed a contest of chance. "The test of the character of the game is not whether it contains an element of chance or an element of skill, but which is the *dominating element* that determines the result of the game?" It follows then that wagering on the outcome of a game of skill is therefore not gambling as it falls outside the ambit of the statute.

*Id*. at 384 (emphasis added) (citations omitted).

Although some have suggested that a game can involve a "material degree" of chance even when chance does not predominate over skill, the *Hua* court's understanding—that the test is satisfied only when chance predominates over skill—comports with the expert commentary on the matter, which suggests that, read in light of the "legislative history, case law, common sense, and the views of many commentators, it ought to be clear that the 'dominating element' test . . . remains valid law in New York State." Bennett Liebman, *Chance v. Skill in New York's Law of Gambling: Has the Game Changed?* 13 Gaming L. Rev. 461, 467 (2009).

Applying the "material degree" test, the *Hua* court dismissed the claim against the defendant for playing mah-jong. In that case, the information "alleg[ed] that people were

---

[12] In chess, as in poker, chance plays a role. Studies have shown that playing the white side of the chessboard—a designation typically awarded by chance—carries with it a significant advantage. *See* "First-move advantage in chess," http://en.wikipedia.org/wiki/First-move_advantage_in_chess (last visited Aug. 4, 2011) (collecting over 15 studies demonstrating that white scores more than black, on average 55 percent to black's 45). However chess, like poker, is not properly regarded as a game of chance because the players exercise significant influence over the outcome of the game.

handing co-defendants money to play mahjong 'which is a game of chance.'" 885 N.Y.S.2d at 385. The court rejected the state's argument, reasoning that the allegation provided "no support . . . for the claim that mahjong is a game of chance." *Id.* While played with tiles, most variants of mahjong share a "shuffle" in common with card games, in that players are dealt tiles which they then use to form melds, in a manner similar to western "rummy" card games.[13] *Hua* thus stands for the proposition that under New York law, the mere fact of a random shuffle of tiles or cards does not introduce a "material degree" of chance into the game.[14]

---

[13] http://www.mastersgames.com/rules/mah-jong-rules.htm.

[14] Another recent case involving mahjong, *People v. Jun Feng*, No. 2011KN054689, 2012 WL 28563, at *4 (N.Y. City Crim. Ct. 2012) (unpublished disposition), likewise acknowledges that "the mere fact that the game combines skill and luck does not make it a contest of chance," and held that mahjong is not "per se" a contest of chance. *Feng* cited *Hua* with approval, and drew heavily from that case's analysis, but it also stated that New York's current definition of a "contest of chance" does not require that chance must predominate over skill, and it noted in *dicta* that "playing stud poker for money is a game of chance and constitutes gambling." *Id*. at *3 (internal quotation marks omitted).

This Court should give no weight to this *dictum* from *Feng*. First, unlike *Hua*, *Feng* is not a published opinion, and therefore is "of little (or no) precedential value" under New York law. *Dubai Islamic Bank v. Citibank, N.A.*, 126 F.Supp.2d 659, 669 n.14 (S.D.N.Y. 2000). Second, the *Feng* court's statements regarding poker were extraneous to the case before it, which concerned mahjong. Third, the *Feng* court's discussion of whether the New York Penal Law requires that chance predominate over skill was likewise *dictum*, as the case did not seek to apply that test; moreover, *Feng* does not claim to contradict *Hua*, which explained the test in detail as stated in this brief. Finally, to the extent that *Feng* argued that the test under New York law has somehow become broader than predominance, that reading is unpersuasive, not least because it would render the statute unconstitutionally vague. "A statute can be impermissibly vague for either of two independent reasons.  First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits.  Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000). Reading the New York Penal Law to authorize enforcement when chance does not predominate over skill would raise concerns on both fronts because the phrase "material degree" would become entirely subjective. This Court should therefore reject that reading of the statute and adopt a narrower construction that preserves the predominance test. *See Skilling v. United States*, 130 S. Ct. 2896, 2931 (2010) (adopting a narrow interpretation of the honest services fraud statute, 18 U.S.C. § 1346, "[t]o preserve the statute without transgressing constitutional limitations"). The rule of lenity also presses in favor of a narrower reading. *See United States v.*

Under the New York Penal Law's test for gambling, poker does not qualify. Poker, like chess, is a game in which skill most often does determine the outcome of the game. In hands involving bluffs, for example, skill counteracts the chance element of the deal of the cards. And even in other hands, a player's skill, manifested as his choices of how much to bet, determines how much he wins (or loses) in a hand, and thus controls the only relevant outcome: the player's profits. Regardless of the cards dealt, a more skilled player will win more hands by bluffing, will win more money on his winning hands by making astute bets, and will lose less money on his losing hands by properly folding those hands, than a less skilled player. Furthermore, when the "outcome" of the game is considered over the span of a series of hands, the role of chance diminishes further. As courts in other states have concluded, poker is not gambling under this test. *See Chimento v. Town of Mt. Pleasant*, No. 2009-CP-10-001551, at 10 (S.C. Ct. C.P. 2009) (holding that the evidence was "overwhelming" that skill predominates over chance in poker), attached as Exhibit E[15]; *Bell Gardens Bicycle Club v. Dept. of Justice*, 36 Cal. App. 4th 717, 744 (Cal. Ct. App. 1995) (poker "predominantly implicate[s] a player's skill").   *But see Commonwealth v. Dent*, 992 A.2d 190, 197 (Pa. Super. Ct. 2010) (holding that poker is predominantly a game of chance).

To be sure, some antiquated cases in New York have described poker as gambling.[16] However, these cases are not controlling because none of them included an analysis of the

_____

*Santos*, 553 U.S. 507, 514 (2008) (plurality opinion) (holding that when a statute is susceptible to two readings, one of which favors the defendant, "the tie must go to the defendant").

[15] *Town of Mt. Pleasant v. Chimento* (heard Oct. 19, 2010), is currently on appeal to the Supreme Court of South Carolina.

[16] *See Luetchford v. Lord*, 11 N.Y.S. 597, 597 (N.Y. Gen. Term. 1890) *rev'd on other grounds*, 30 N.E. 859 (N.Y. 1892) (finding, without discussion, that poker was a game of chance); *In re Fischer*, 247 N.Y.S. 168, 178–79 (N.Y. App. Div. 1930) (stating, in an attorney discipline case, that playing cards for stakes was "technically gambling"); *People v. Dubinsky*, 31 N.Y.S. 2d 234, 236 (N.Y. Ct. Spec. Sess. 1941) (finding that a particular variant of stud poker was gambling);

element of skill in poker. Furthermore, whether chance is present to a material degree is a question of fact, not law. *See, e.g.*, *S. & F. Corp. v. Wasmer*, 91 N.Y.S.2d 132, 136 (N.Y. Sup. 1949).[17] As a result, these dated and distinguishable holdings should not be treated as

---

*Katz's Delicatessen, Inc. v. O'Connell*, 97 N.E.2d 906, 907 (N.Y. 1951) (poker treated as gambling without discussion).

A more recent case involving a variant of three card monte, *People v. Turner*, 629 N.Y.S.2d 661, 662 (N.Y. Crim. Ct. 1995), stated in *dicta* that poker is a game of chance "since the outcome depends to a material degree upon the random distribution of the cards. The skill of the player may increase the odds in the player's favor, but cannot determine the outcome regardless of the degree of skill employed." Aside from the fact that this statement was pure *dicta*, it was poorly reasoned, as the premise that the players cannot determine the outcome of the game is demonstrably false. The *Turner* court's error stemmed from its reliance on *In re Plato's Cave Corp. v. State Liquor Authority*, 496 N.Y.S.2d 436 (N.Y. App. Div. 1985), *aff'd,* 506 N.Y.S.2d 856 (1986), a case about video poker—which is entirely distinguishable from the peer-to-peer poker games offered here, in that the players in video poker are essentially playing a slot machine: they cannot bluff, their wins or losses are determined solely by the turn of the cards, and the video poker machine retains a house "edge" over the player. *See United States v. 294 Various Gambling Devices,* 708 F.Supp. 1236, 1243 (W.D. Pa. 1989) ("Indeed all the skill elements associated with the ordinary game of draw poker are conspicuously absent in the video version. In video poker there is no raising, no bluffing, no money management skills."); *Collins Coin Music Co. of N.C., Inc. v. N.C. Alcoholic Bev. Control Comm'n*, 451 S.E.2d 306, 308 (N.C. Ct. App. 1994) (same). Moreover, *Turner* is questionable authority even for its holding, as other New York courts have held that three card monte is a game of skill. *See People v. Mohammed*, 724 N.Y.S.2d 803, 805-06 (N.Y. Crim. Ct. 2001); *People v. Hunt*, 616 N.Y.S.2d 168, 170 (N.Y. Crim. 1994). These contradictory holdings regarding three-card monte demonstrate not only the weakness in *Turner's* reasoning, but also the risk of vagueness inherent in a broad interpretation of the New York Penal Law's test for gambling—individuals promoting the same game could obtain wildly different answers to the same legal question.

[17] It is important to highlight one key difference between the New York Penal Law and the IGBA. Under the New York Penal Law, the question is whether, as a matter of fact, chance is present to a material degree in poker—*i.e.*, whether chance predominates over skill. Under the IGBA, the question is whether poker is sufficiently similar to the enumerated games to qualify as "gambling." *Amicus* believes that this Court can take judicial notice of facts sufficient to resolve both inquiries in defendant's favor. However, to the extent that the Court disagrees, and concludes that the state law inquiry is too fact-intensive for a motion to dismiss, the Court can nevertheless still rule on the federal question. Under the IGBA, this Court need not determine whether chance predominates over skill—rather, it need only consider whether poker is house-banked, and whether poker is *purely* a game of chance, *i.e.*, a game in which the players have no opportunity to determine the outcome. Only if the Court resolves both of those questions in the affirmative does poker fall within the federal definition of "gambling." And the Court can resolve those questions simply by examining the rules of the game, which are beyond dispute. Of

precedential, especially given the advances made in the understanding of the game of poker over the last several decades.[18]

Because skill predominates over chance in determining the outcome in poker, this Court should hold that poker is not a "contest of chance" under New York Penal Law § 225.00.  If poker is not a "contest of chance" under state law, then conducting a poker game cannot be a predicate violation for the purposes of the IGBA. *See* 18 U.S.C. § 1955(b)((1)(i) (providing that in order to violate the IGBA, a "gambling business" must be "a violation of the law of a State or political subdivision in which it is conducted").

## CONCLUSION

The PPA respectfully submits this memorandum to provide the Court with pertinent information regarding the game of poker and to present the perspective of its members regarding the nature of poker, in the hopes that this information will aid this Court in reaching a just decision in the case before it.

Respectfully submitted,

_____/s/_____
Kenneth Dreifach
Bar Code KD 4816
ZwillGen PLLC
415 Madison Avenue, 11th Floor
New York, NY 10017
ken@zwillgen.com
Tel: (347) 210.1798
On Behalf of the Poker Players Alliance

---

course, if this Court disagrees with that analysis and concludes that the IGBA incorporates its own predominance test, then further factual development may be necessary.

[18] For instance, at the time these cases were decided, there were no statistical analyses of millions of poker hands, nor had scholars and researchers dedicated nearly as much attention to the dynamics of poker games. Instead, these courts considered purely anecdotal evidence to arrive at their conclusions.

**Certificate of Service**

I hereby certify that on July 3, 2012, the foregoing documents were filed with the Clerk of the Court and served in accordance with the Federal Rules of Civil Procedure, and/or the Eastern District's Local Rules, and/or the Eastern District's Rules on Electronic Service upon the following parties and participants:

Marisa M. Seifan
Tanya Yvette Hill
Lan Nguyen
Nathan Daniel Reilly
United States Attorneys' Office
Eastern District of New York
Criminal Division
271 Cadman Plaza East
Brooklyn, NY 11201-1820
718-254-6144
718-254-7499 (fax)
marisa.seifan@usdoj.gov
Tanya.Hill@usdoj.gov
nathan.reilly@usdoj.gov
lan.nguyen@usdoj.gov


Kannan Sundaram
Federal Defenders
One Pierrepont Plaza, 16th Floor
Brooklyn, NY 11201
718-330-1203
718-855-0760 (fax)
kannan_sundaram@fd.org

_____/s/_____
Kenneth Dreifach
Bar Code KD 4816
ZwillGen PLLC
415 Madison Avenue, 11th Floor
New York, NY 10017
ken@zwillgen.com
Tel: (347) 210.1798