UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------x

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| - v. - | : |
| LAWRENCE DICRISTINA, | :   **11-CR-414 (JBW)** |
| Defendant. | : |

-------------------------------------------------------x

**DEFENDANT LAWRENCE DICRISTINA'S SUPPLEMENTAL BRIEF**

Kannan Sundaram
Attorney for Lawrence Dicristina

Federal Defenders of New York, Inc.
One Pierrepont Plaza
Brooklyn, New York 11241
Tel. (718) 330-1203

## I.  Introduction

At Friday's *Daubert* hearing, the Court indicated its recognition that in this prosecution under the Illegal Gambling Business Act ("IGBA"), 18 U.S.C. § 1955, the Government must prove that the defendant engaged in "gambling" as that term is defined by the federal statute, a definition that does not turn on the meaning of the alleged predicate violation under state gambling law. The Court also indicated that whether poker constitutes "gambling" under the IGBA is a question of law for the Court. The Court took the view, pending further briefing, that poker qualifies as "gambling" under the IGBA as a matter of law.

In support of that view, the Court indicated its understanding that the legislative history suggests that Congress intended to curb poker games operated by organized crime entities. The Court also indicated its understanding that the legislative history is sparse, and that it generally refers to numbers rackets, not poker games.

This Supplemental Brief sets forth defendant's argument that poker does not satisfy the IGBA's independent "gambling" requirement.[1] The legislative history does not support the conclusion that the IGBA reaches poker, nor does the text of the statute. At most, the statute is ambiguous. Under these circumstances, the rule of lenity requires the Court to adopt the narrower view of the IGBA's definition of "gambling," under which an activity can be regarded as such only if it is a "game of chance." The Government has not even attempted to argue that poker is such a game, and based on the evidence already before the Court, it cannot be said that poker falls within that interpretation of the statute.

---

[1] For the reasons stated in parts 1, 2, and 3 of defendant's response to the government's motion to exclude the testimony of his expert witness, filed on July 6, defendant objects to this Court's ruling that whether poker is "gambling" is a question of law for the Court, and not an essential element of the IGBA offense or a mixed question of law and fact for the jury. Defendant also respectfully requests that the Court reconsider that ruling. However, for the purposes of this Supplemental Brief, in accord with the Court's ruling, defendant treats the matter as one of law.

This brief also argues that poker is not a "contest of chance" under the New York Penal Law. In the alternative, it argues that the Court cannot make that determination because the issue is a mixed question of law and fact reserved for the jury, and so the cases upon which the Court relied cannot be treated as precedential.[2]

## II. The IGBA's Definition of "Gambling" Does Not Include Poker

The IGBA provides that "'gambling' includes but is not limited to pool-selling, bookmaking, maintaining slot machines, roulette wheels or dice tables, and conducting lotteries, policy, bolita or numbers games, or selling chances therein." 18 U.S.C. § 1955(b)(2). It is beyond dispute that poker is not one of the enumerated activities in the IGBA's definition, and so the sole remaining question is whether the word "gambling" itself necessarily includes poker. Neither the IGBA's legislative history, nor the text nor purpose of the statute support that conclusion. At the very most, one could say that the statute is ambiguous with regard to poker. But when a criminal statute suffers from ambiguity, the rule of lenity requires that courts construe the statute narrowly, not expansively. Thus, this Court should hold that the IGBA's definition of gambling does not reach poker.

### A. The IGBA's Legislative History Does Not Suggest Any Congressional Concern With Poker

The IGBA was enacted as Title VIII of the Organized Crime Control Act of 1970. The Act, which comprised eleven separate titles, was drafted by the Department of Justice, and designed to provide the government with new and more effective tools to curb organized crime. The Act's most significant provision was Title IX, commonly known as the Racketeer Influenced and

---

[2] These issues were also discussed in the Poker Players Alliance's *amicus* brief supporting defendant's motion to dismiss, and in defendant's response to the Government's motion to exclude the expert testimony. Defendant respectfully requests that the Court also review those submissions as it considers the meaning of the IGBA statute.

Corrupt Organizations Act ("RICO"). The IGBA was part of Title VIII of the statute, which also made it a federal crime to conspire to obstruct local investigations of illegal gambling operations, *see* 18 U.S.C. § 1511.

At the time of the IGBA's enactment, the government was clear that its scope and purpose were limited. Assistant Attorney General Wilson, who bore primary responsibility at the Department of Justice for drafting the bill, "emphasize[d] that we are not trying to bring the whole gambling enforcement problem into the Federal jurisdiction, the Federal courts."[3] *Organized Crime Control: Hearings Before Subcomm. No. 5 of the H. Comm. on the Judiciary*, 91st Cong. 194 (1970) (hereinafter "*House Judiciary Hearings*"). Rather, the statute was "intended to reach only those persons who prey systematically upon our citizens and whose syndicated operations are so continuous and so substantial as to be of national concern, and those corrupt State and local officials who make it possible for them to function." *Organized Crime Control Act of 1970*, H.R. Rep. No. 91-1549, at 53 (1970); *see also Organized Crime Control Act of 1969*, S. Rep. No. 91-617, at 73 (1969) (Senate Report containing similar language). And in justifying the statute to Congress, the Attorney General himself was emphatic that the statute "is an anti-racketeering measure only and, if enacted, will be enforced by the Department of Justice strictly in accord with its legislative purpose." *House Judiciary Hearings* 170 (Statement of John N. Mitchell).

That "legislative purpose" was narrow: to enable federal prosecution of major intrastate gambling rackets, particularly numbers operations. Prior to the enactment of the IGBA, Congress had already passed several other laws designed to target the gambling operations of

---

[3] At the House Judiciary Committee Hearings, the Attorney General told the legislative staff that "we call [the IGBA] the Wilson bill," and suggested that Wilson answer questions about the statute. *House Judiciary Hearings* at 191.

3

organized crime. These included the Wire Wager Act of 1964, 18 U.S.C. § 1084, the Travel Act, 18 U.S.C. § 1952, and the Paraphernalia Act, 18 U.S.C. § 1953. These statutes respectively make it unlawful to transmit sports wagering information across state lines, to travel across state lines to further unlawful activity (including gambling), and to send wagering paraphernalia – defined as any record or paraphernalia "designed for use in (a) bookmaking; or (b) wagering pools with respect to a sporting event; or (c) in a numbers, policy, bolita, or similar game" – across state lines.

Against this backdrop, the Department of Justice determined that it needed the IGBA because existing gambling statutes required the government to prove, on a case by case basis, that information, individuals, or paraphernalia had crossed state lines. In committee hearings to enact the IGBA, Assistant Attorney General Will Wilson, who had primary responsibility for drafting the statute, explained that the existing interstate-nexus requirement created a "loophole" for large *intrastate* gambling rings – particularly "numbers" rackets – and that "[v]ery few numbers operations have been prosecuted at a Federal level because very seldom are state lines crossed . . . ." *Measures Relating to Organized Crime: Hearings Before the Subcomm. on Crim. Laws & Procedures of the S. Comm. on the Judiciary*, 91st Cong. 382-83 (1969) (hereinafter "*Senate Judiciary Hearings*") (statement of Assistant Attorney Gen. Will Wilson). The IGBA fixed the "loophole" because it included "congressional findings that illegal gambling as a whole has an adverse effect upon interstate commerce and its facilities," and thus "obviated" the need for proof of an interstate nexus in each case. *Id*. at 383; *see also House Judiciary Hearings* 156-57 (Statement of John N. Mitchell, Attorney General) ("Federal jurisdiction under existing law . . . depends upon the establishment of a specific link to interstate commerce on a case-by-case basis. As a result, many large-scale and lucrative illegal gambling operations, which we have reason to

4

believe are dominated by the Cosa Nostra, escape prosecution."); *id*. at 170 ("Huge gambling rings, whose activities are of legitimate concern to the Federal Government, now flourish in metropolitan areas immune from our law enforcement efforts.").

There was no doubt at the time the IGBA was enacted that its primary target was numbers. In his message to Congress on Organized Crime, President Nixon singled out "the numbers racket" as a particularly important and pernicious form of gambling. *See Senate Judiciary Hearings* 444 (Message from the President of the United States Relative to the Fight Against Organized Crime). The Attorney General did the same in his remarks to the Senate. *See id*. at 108 (statement of John N. Mitchell). And Senators likewise noted that "[t]he greatest single source of revenue for organized crime is its gambling activities, which net an estimated seven (7) to fifty (50) billion dollars a year . . . . A great portion of this is gained through numbers rackets, draining from the poorest inhabitants of our ghettos and slums and their families precious dollars which should be spent for food, shelter and clothing." *Senate Judiciary Hearings* 158 (Statement of Sen. Tydings). Senator McClellan, one of the IGBA's sponsors, pointed out that numbers was a predatory enterprise because the odds were so heavily stilted against the players, and he also explained that the numbers made substantial contributions to organized crime revenues. *See House Judiciary Hearings* at 87 (Statement of Sen. McClellan) (expressing concern over the effect of the stilted odds in numbers and its contribution to organized crime revenues); *id*. at 400 (Statement of Vincent L. Broderick, Chairman N.Y. Cnty. Lawyers Ass'n) (same). There was also concern that numbers operators had corrupted local law enforcement officials, and thus harmed communities by undermining law and order. *See, e.g.*, *Organized Crime Control Act of 1969*, S. Rep. No. 91-617, at 72 (1969).

William Hundley, who had served for seven years as the head of the Organized Crime and Racketeering Section at the Department of Justice, put a fine point on the matter, testifying that:

> [P]robably the *only* area where [the IGBA] would be helpful would be in getting at big numbers rackets, because in my experience in the Justice Department any gambling operation that was worth Federal concern had an interstate aspect, and that you could proceed under [the Paraphernalia Act] and the other bills. But some of the really big numbers operations, particularly in a place like New York, can be, by the nature of the operation, self-contained . . . and you could use this new [statute] against those. *I don't see that it would be really of much use otherwise in the gambling area.*

*Senate Judiciary Hearings* 425 (Statement of William Hundley) (emphasis added).

Of course, syndicated gambling was broader than numbers, and the IGBA was therefore broader as well. But the sponsors of the statute were not concerned with all of the activities that one might conceivably describe as gambling, but rather with games that generated significant revenue for organized crime and thus permitted it to flourish. They identified, in addition to numbers, betting on horse racing, sporting events, lotteries, dice games, and illegal casinos as important forms of syndicated gambling. *See* 116 Cong. Rec. 590 (1970) (statement of Sen. McClellan); *see also id*. at 596 (Senator McClellan introduced an article explaining that most gambling is "on the numbers," and that "[b]ookmaking is next up the ladder from the numbers"); *id*. at 603 (Statement of Senator Allott) (noting that the IGBA targets "such forms of betting as bookmaking or numbers"); President's Commission on Law Enforcement & Administration of Justice, *The Challenge of Crime in a Free Society* 188 (1967) (noting that organized criminals offered a range of games from "lotteries, such as 'numbers' or 'bolita,' to off-track horse betting, bets on sporting events, large dice games and illegal casinos."). Congress recognized that "[t]he directors and managers of the major numbers, booking, and sports gambling operations across the country are, of course, the same Mafia leaders who engage in extortion, labor racketeering, corruption of legitimate business, and the panoply of other illegitimate enterprises which support

6

organized crime," and so targeted them for enforcement. *House Judiciary Hearings* 105 (Statement of Sen. McClellan). Ultimately, the list of games that Congress used to define gambling, which includes "pool-selling, bookmaking, maintaining slot machines, roulette wheels or dice tables, and conducting lotteries, policy, bolita or numbers games, or selling chances therein," 18 U.S.C. § 1955(b)(2), identifies games that all generated significant revenues for organized crime.

In contrast with these statements, no sponsor of the bill or official in the Department of Justice referred to poker games as a target for IGBA enforcement. No official ever stated that poker games afflicted poor neighborhoods the way that numbers rackets did, that the operators of poker games used proceeds from those games to fund other illegal operations, or that poker corrupted local law enforcement. In sum, the concerns that motivated the passage of the IGBA never related to poker games.

This is not, of course, to say that no organized crime entity ever sponsored a poker game. As the Court pointed out at the *Daubert* hearing, some organized crime entities have done so. But organized crime entities have done a lot of things that do not fall under the IGBA, including infiltrating legitimate businesses. The Government's tool to combat those enterprises is the RICO statute, not the IGBA. What the legislative history shows is that even if organized crime operated the occasional poker game, those games were not a driving force behind the IGBA.

In the context of the IGBA's enactment, the silence regarding poker is significant. The prior gambling statutes, including the Wire Act and the Paraphernalia Act, expressly and solely targeted sports betting and lotteries, including numbers. No statements in the IGBA's legislative history indicated that Congress felt the need to ban additional games. Rather, the Department of Justice explained that its problem was enforcing existing prohibitions against purely intrastate

7

operations. And it is not as if poker was unknown at the time. Poker has been an American institution since the 1800s. President Nixon, who signed the IGBA into law, was himself a well known poker player. And Senators, Representatives, judges, and other respectable individuals all were known to play the game, and presumably understood the differences between a game of poker and operations like numbers and sports betting. In light of these facts, Congress's decision not to include poker in the IGBA's definition of "gambling" is telling, especially when it opted to include obscure version of lottery games, such as "bolita."

The absence of any mention of poker in the legislative history is especially telling in light of the Department of Justice Office of Legal Counsel's (OLC) recent memorandum regarding the scope of another federal gambling statute, the Wire Act. In September of 2011, OLC determined that contrary to the longstanding view of the Department of Justice's Criminal Division, the Wire Act prohibits only the transmission of wagers and information regarding wagers relating to sporting events – and not all wagers, regardless of the subject matter. *See generally* Office of Legal Counsel, U.S. Dep't of Justice, *Whether proposals by Illinois and New York to use the internet and out-of-state transaction processors to sell lottery tickets to in-state adults violate the Wire Act* (Sept. 20, 2011) (hereinafter "OLC Memo"). For years, the Criminal Division had aggressively enforced the Wire Act against a wide variety of defendants, including online poker operators.[4] In rejecting the Criminal Division's view of the Wire Act, OLC treated the statute's

---

[4] *See, e.g.*, *United States v. Vinaithong*, 188 F.3d 520, 1999 WL 561531, at *1 (10th Cir. 1999) (unpublished decision) (charging operators of "mirror lottery" with violation of Wire Act); *United States v. Manetti*, 323 F.Supp. 683, 687 (D. Del. 1971) (prosecuting operators of numbers racket engaged in "lottery policy writing"); *New York v. World Interactive Gambling Corp.,* 714 N.Y.S.2d 844 (N.Y. Sup. Ct. 1999) (alleging online casino based in Antigua with violations of the Wire Act for offering virtual slot machines, blackjack and roulette).

[4] *See, e.g.*, *United States v. $6,637,076.23 in U.S. Currency Funds Previously on Deposit at Goldwater Bank in Scottsdale, AZ, in Account No. 160201, Held in the Name of Allied Wallet, Inc.*, No. 10 Civ. 6169 (S.D.N.Y. Aug. 17, 2010) (considering argument by government that

legislative history as a critical factor. Citing the House Judiciary Committee Report, among other sources, OLC observed that Congress's "overriding goal in the Act was to stop the use of wire communications for sports gambling in particular. Congress was principally focused on off-track betting on horse races, but also expressed concern about other sports-related events or contests, such as baseball, basketball, football, and boxing." OLC Memo at 8-9. OLC also noted that while the Paraphernalia Act specifically prohibits the transportation of materials used in bookmaking, sporting pools and lottery games, the Wire Act mentions only sporting events. The contrast between the statutory texts also persuaded OLC that "Congress did not intend to reach non-sports wagering in the Wire Act." *Id*. at 11.

In the IGBA, as in the Wire Act, Congress described with particularity the games that it sought to regulate, and the legislative history demonstrates that it was these particular games (and games like them) that motivated the Department of Justice to draft – and Congress to enact – the IGBA. Neither the Department nor Congress ever suggested a desire to regulate poker games, and so just as the Government itself recognized that it had overreached in enforcing the Wire Act against non-sports betting operations, this Court should hold that the Government has overreached in attempting to apply the IGBA to poker.

---

defendant funds were subject to forfeiture as proceeds traceable to online poker in violation of the Wire Act); *United States v. Rennick*, No. 1:09-cr-00752 (S.D.N.Y. May 11, 2010) (charging Wire Act violations for payments made related to "poker, blackjack, slot machines, and other casino games"); *United States v. Dikshit*, No. 1:08-cr-01265 (S.D.N.Y. Dec. 16, 2008) (charging Wire Act violation for operation of an internet business offering casino and poker games); *United States v. Diskhit*, No. 1:08-cr-01265 (S.D.N.Y. Sept. 21, 2009) (obtaining defendant's guilty plea to Wire Act charges for offering online casino and poker games, with forfeiture of $300 million); *United States v. $289,508.74 in U.S. Funds, More or Less, and All Proceeds Therefrom, Representing All Funds Contained in Suntrust Bank Account Number XXXXXX6205*, Case 2:10-cv-01853 (W.D. Wash. Nov. 15, 2010) (alleging violation of Wire Act in forfeiture action against bank accounts containing online poker funds); *United States v. Schuett*, No. 2:10-mj-01015 (M.D. Fla. Feb. 17, 2010) (seeking search warrant to find evidence of Wire Act violations stemming from payment processing for online poker companies).

## B. The Text of the IGBA Does Not Reach Poker

The legislative history, of course, is an aid to interpreting the statutory text. Here, as noted above, the text of the IGBA does not expressly mention poker. For the reasons explained in defendant's motion to dismiss, as well as in the Poker Players Alliance *amicus* brief, poker is also fundamentally dissimilar from the activities enumerated in the IGBA's definition of gambling. Thus, for this Court to conclude that poker is gambling, it must decide that something about the definition of the word "gambling" itself necessarily encompasses poker. It does not.

The plain meaning of the term "gambling" does not clearly include poker. The Oxford English Dictionary defines "gambling" as "[t]he action of gamble *v*." Oxford English Dictionary (2d ed. 1989), online version June 2012, http://oed.com/view/Entry/76450.[5] It defines the intransitive verb "gamble," in turn, as "[t]o play games of chance for money, *esp.* for unduly high stakes; to stake money (*esp.* to an extravagant amount) on some fortuitous event." *Id.*, http://oed.com/view/Entry/76447.[6]

The IGBA's definition of "gambling" uses the word as an intransitive verb. *See* 18 U.S.C. § 1955(b)(2). Thus, the ordinary meaning of "gambling," as the IGBA uses it, is "[t]o play games of chance for money," or "to stake money . . . on some fortuitous event." The definition plainly

---

[5] The Supreme Court recently described the Oxford English Dictionary as "one of the most authoritative on the English language" in using it to interpret the terms of a federal statute. *Taniguchi v. Kan Pacific Saipan, Ltd.*, 132 S. Ct. 1997, 2003 (2012). Other well-known dictionaries produce consistent definitions. For example, the American Heritage Dictionary's first definition of the intransitive verb "gamble" is "[t]o bet on an uncertain outcome, as of a contest," or "[t]o play a game of chance for stakes." *See* American Heritage Dictionary of the English Language, http://ahdictionary.com/word/search.html?q=gambling.

[6] The dictionary also provides a definition of the transitive verb "gamble" as "[t]o stake, risk in gaming," and gives an example from Oliver Wendell Holmes: "Tacitus sys that the Germans would gamble their personal liberty and pay with their persons if they lost." The dictionary also includes a definition of the adjective "gambling," which means "[t]hat gambles or plays for high stakes; *orig.* that plays unfairly, that cheats at play." Oxford English Dictionary (2d ed. 1989), http://oed.com/view/Entry/76451.

incorporates a distinction between games of chance and games of skill. To the extent that poker is a game of skill, it cannot fall within the meaning of the term. Thus far, the evidence presented at the *Daubert* hearing, together with the showing in the Poker Players Alliance's *amicus* brief and its accompanying exhibits have all shown that poker is a game of skill, and those statements have not been contradicted by the Government.

That reading is entirely consistent with the remainder of the IGBA's definition of "gambling." The nine enumerated activities all refer to wagering on either games of chance or fortuitous events. None of the enumerated activities closely resemble poker.

The reading that "gambling" requires the game to be one of chance also finds support in the common law. "[W]hen Congress uses language with a settled meaning at common law, Congress presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed." *Beck v. Prupis*, 529 U.S. 494, 500-01 (2000).

"Gambling" has an established meaning at common law—requiring three elements: consideration, chance, and a prize. *Att'y Gen. v. PowerPick Club*, 793 N.W.2d 515, 533 (Mich. Ct. App. 2010); *see also Barber v. Jefferson Cnty Racing Ass'n, Inc.*, 960 So.2d 599, 616 (Ala. 2006) (setting forth the three elements, and also explaining that "[g]ambling is as old as man, and certainly as old as the common law") (internal quotation marks omitted); *Internet Community & Entertainment Corp. v. State*, 201 P.3d 1045, 1050 n.5 (Wash. App. Div.), *rev'd on other grounds* 238 P.3d 1163 (Wash. 2010). Furthermore, in the common law, "chance" means "a lack of control over events or the absence of a controllable causation – the opposite of intention." *Barber*, 960 So. 2d at 609 (citing *Opinion of the Justices*, 795 So.2d 630, 635 (Ala. 2001)). Courts addressing the element of chance under the common law standard have

concluded that chance must be "the dominant factor in a participant's failure or success in any particular game or scheme" for the element to be satisfied. *Opinion of the Justices*, 795 So.2d at 641.[7]

The common law meaning of "gambling," which the Department of Justice certainly knew of when it drafted the IGBA, and which Congress is presumed to have understood at the time it enacted the statute, is fully consistent with a definition of gambling that requires that chance predominate over skill. Since there is no evidence in the legislative history or anywhere else that Congress intended for the statute to reach more broadly, this Court should hold that the IGBA's definition of "gambling" is too narrow to encompass games of skill like poker.

In addition to using "gambling" as an intransitive verb, the IGBA also uses the word as an adjective, *i.e.*, a "gambling business." Another possible reading of the statute is therefore that it applies only to a business that itself engages in gambling. On that reading, poker operators are exempt because unlike a bookmaker that bets against his customers, or the house in a casino that bets against roulette players, or a lottery operator that keeps any moneys that are not paid out to the players, a poker room does not participate in the games themselves – instead, it merely facilitates the games and takes a fee for providing the service.

---

[7] This predominance standard for determining the element of chance has been adopted by a majority of states. *See, e.g., In re Request of Governor for Advisory Opinion*, 12 A.3d 1104, 1112 (Del. 2009); *Chimento v. Town of Mt. Pleasant*, No. 2009-CP-10-001551, at 10 (S.C. Ct. C.P. 2009); *People v. Li Ai Hua*, 885 N.Y.S.2d 380, 384 (N.Y. City Crim. Ct. 2009); *Opinion of the Justices*, 795 So. 2d at 640-41; *Wisconsin v. Hahn*, 586 N.W.2d 5, 10 (Wis. Ct. App. 1998); *Harris v. Missouri Gaming Comm'n*, 869 S.W.2d 58, 62 (Mo. 1994); Lashbrook v. State, 550 N.E.2d 772, 775 (Ind. Ct. App. 1990); *Roberts v. Communications Inv. Club of Woonsocket*, 431 A.2d 1206, 1211 (R.I. 1981); *Berckefeldt v. Hammer*, 616 P.2d 183,184–85 (Colo. Ct. App. 1980); *Commonwealth v. Two Electronic Poker Game Machines*, 465 A.2d 973, 977–78 (Pa. 1983); *Indoor Recreation Enters., Inc. v. Douglas*, 235 N.W.2d 398, 400 (Neb. 1975); *Morrow v. State*, 511 P.2d 127, 129 (Alaska 1973); *In re Allen*, 377 P.2d 280, 280 (Cal. 1962); *Las Vegas Hacienda, Inc. v. Gibson*, 359 P.2d 85, 87 (Nev. 1961); *State v. Stroupe*, 76 S.E.2d 313, 316–17 (N.C. 1953); *Massachusetts v. Lake*, 57 N.E.2d 923, 925 (Mass. 1944); *D'Orio v. Startup Candy Co.*, 266 P. 1037, 1038 (Utah 1928).

Of course, it is possible to find other dictionary definitions of "gambling," which do not mention the element of chance. However, if choosing between the Oxford English Dictionary's definition and those definitions, the rule of lenity requires this Court to adopt the former. "The rule of lenity requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them." *United States v. Santos*, 553 U.S. 507, 514 (2008) (plurality opinion). As the Supreme Court has explained:

> This venerable rule not only vindicates the fundamental principle that no citizen should be held accountable for a violation of a statute whose commands are uncertain, or subjected to punishment that is not clearly prescribed. It also places the weight of inertia upon the party that can best induce Congress to speak more clearly and keeps courts from making criminal law in Congress's stead.

*Id*. In *Santos*, the Court faced a situation virtually identical to that at issue here. The defendant had been charged under the money laundering statute, which makes it unlawful to engage in certain transactions involving the "proceeds" of criminal activity. The indictment alleged that the defendant had executed transactions involving the receipts of his gambling business, and that those transactions constituted a separate money laundering violation. The defendant challenged his conviction on the ground that the word "proceeds" did not mean "receipts," but instead meant "profits," so that any transactions directed solely toward paying the business's essential expenses could not constitute money laundering.

Applying the rule of lenity, the Supreme Court agreed with the defendant. The Court reasoned that the term "proceeds" was not defined in the statute, so that it therefore takes "its ordinary meaning." *Id*. at 511. Citing various dictionaries, the Court noted that "'[p]roceeds' can mean either 'receipts' or 'profits.' Both meanings are accepted, and have long been accepted, in ordinary usage." *Id*. Moreover, the term did not have "a common meaning in the provisions of the Federal Criminal Code," and the context of the statute likewise left "the

13

ambiguity intact" because the money laundering statute "makes sense under either definition." *Id.* at 511-12. The Court thus concluded that:

> Under either of the word's ordinary definitions, all provisions of the federal money-laundering statute are coherent; no provisions are redundant; and the statute is not rendered utterly absurd. From the face of the statute, there is no more reason to think that "proceeds" means "receipts" than there is to think that "proceeds" means "profits." Under a long line of our decisions, the tie must go to the defendant.

*Id.* at 513-14.

This case is *a fortiori* from *Santos*. It is beyond dispute that the IGBA would be "coherent" if "gambling" means "[t]o play games of chance for money." Likewise, no provision of the statute would be rendered "redundant" or "utterly absurd" by that reading. Moreover, to the extent that the word "gambling" has "a common meaning" in the criminal law, that meaning supports a narrower interpretation of "gambling," *i.e.*, that chance must predominate over skill. Additionally, the context of the statute likewise suggests that the definition of "gambling" should be read narrowly. The enumerated activities in the definition of "gambling" all act to limit the definition to games "that are roughly similar, in kind . . . to the examples themselves." *Begay v. United States*, 553 U.S. 137, 143 (2008). Had Congress intended to make the statute "all-encompassing, it is hard to see why it would have needed to include the examples at all." *Id.* at 142.

Finally, for the reasons set forth in subpart A, the legislative history also presses in favor of a narrow definition of "gambling." Congress and the Department of Justice had already identified the types of games they wanted to target – and the principal targets were lotteries like numbers, sports betting, and illegal casino games. Peer-to-peer poker games and other contests of skill were never identified as part of the enforcement agenda, and expanding the statute to cover them would not be consistent with congressional intent. If Congress wishes for the IGBA to reach

14

poker, then it can easily amend the statute's definition of "gambling" to include that game. But unless and until Congress does so, this Court should not, on its own initiative, broaden the terms of a criminal prohibition.[8]

For these reasons, this Court should hold that the IGBA's definition of "gambling" games is limited to games of chance, or to games in which the business itself participates in games of chance. Because the Government has submitted no evidence that poker would qualify as "gambling" under that standard, and because the evidence before this Court compels the opposite conclusion, this Court should hold that the IGBA's definition of "gambling" does not encompass poker.

### III. Poker Is Not a "Contest of Chance" Under the New York Penal Law

This Court erred in holding that poker is per se a "contest of chance" under the New York Penal Law. At the *Daubert* hearing, this Court alluded to various New York cases which have stated that poker is gambling. But in New York, as in almost every state, whether a game falls within the scope of the state's gambling prohibition is a question of fact or a mixed question of fact and law. As such, these questions must be decided on a case by case basis, and past cases holding that poker is gambling are not precedential. That is why New York courts themselves have reached varying results regarding, for example, three card monte and its variants, with some courts holding that they constitute contests of chance, and others holding that they constitute games of skill. *Compare People v. Turner*, 629 N.Y.S.2d 661, 662 (N.Y. Crim. Ct. 1995) (holding that a variant of three card monte was a contest of chance) *with People v. Mohammed*,

---

[8] Defendant acknowledges that a number of IGBA convictions involving poker have been both secured and upheld. However, defendant has never seen a case – not one – in which the defendant argued that poker is not gambling, and the court rejected that argument. This Court should not treat as precedential decisions that never passed upon this question.

15

724 N.Y.S.2d 803, 805-06 (N.Y. Crim. Ct. 2001) (reaching the opposite conclusion) and *People v. Hunt*, 616 N.Y.S.2d 168, 170 (N.Y. Crim. 1994) (same).

Moreover, for the reasons explained in defendant's July 6 letter to the Court, the cases relied upon by the Government in this regard are unpersuasive. Many mention poker only to *dicta*, others do not address the sort of Hold'Em poker that was played here, and the remainder rest on either flawed reasoning or no reasoning at all. None of these cases suggests that a court considered and rejected the type of evidence offered in this case.

In light of the most on-point authorities – which are identified in defendant's July 6 letter, the Poker Players Alliance's *amicus* brief, and defendant's motion to dismiss – the New York Penal Law applies only if chance predominates over skill, and the Government has neither alleged nor proved that to be the case with regard to Hold'Em poker. While the evidence shows that there is a chance element in poker, that is comparable to the role of chance in games such as golf, which are universally regarded as games of skill.

## IV. Conclusion

This Court should hold that poker is not gambling under the IGBA as a matter of law. In the alternative, defendant respectfully requests that the Court reconsider its holding that whether poker constitutes "gambling" constitutes an issue of law, and submit to the issue to the jury – together with appropriate evidence, including testimony from Dr. Heeb, to assist the jury in its assessment of the role of skill and chance in poker.

This Court should also hold hold that poker is not a "contest of chance" under New York law or, in the alternative, submit that question to the jury as well, again with the assistance of appropriate expert testimony.

Dated: July 8, 2012
      Brooklyn, New York