UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -                  11-CR-414 (S-2)(JBW)

LAWRENCE DICRISTINA,

              Defendant.

- - - - - - - - - - - - - - - - X


GOVERNMENT'S MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANT'S RULE 29 MOTION


                                    LORETTA E. LYNCH
                                    United States Attorney
                                    Eastern District of New York
                                    271 Cadman Plaza East
                                    Brooklyn, NY 11201

Nathan Reilly
Marisa Megur Seifan
Assistant U.S. Attorneys

<u>PRELIMINARY STATEMENT</u>

Following a three-day trial, the defendant Lawrence DiCristina was convicted of conspiring to operate and operating an illegal underground poker club in violation of Title 18, United States Code, Section 371 and Title 18, United States Code, Section 1955 (hereinafter, the "Illegal Gambling Business Act" or "the IGBA").  During the trial, the government established that the defendant's gambling operation generated thousands of dollars of revenue, sought to conceal its existence from law enforcement and the public at large, and employed dealers, an armed security guard, and a waitress who doubled as a masseuse.  Despite the overwhelming evidence that the defendant operated an illegal gambling business, on July 11, 2012, he moved to vacate his conviction on the ground that the gambling activity he administered at his club -- no-limit Texas Hold'em, a popular variety of poker -- does not constitute gambling under the IGBA. The defendant's argument is devoid of any foundation in law or common sense.  Since its inception, poker has been universally considered a form of gambling, and neither the structure of the statute nor the underlying policy concerns driving its enactment suggest otherwise.  The defendant's motion should be denied, and his conviction should be upheld.

ARGUMENT

I.   The Government Has Satisfied Its Burden of Proof with
     Respect to Each of the IGBA Elements

        Section 1955(a) of the IGBA states that "[w]hoever

conducts, finances, manages, supervises, directs, or owns all or

part of an illegal gambling business shall be [punished]."  The

statute further states that an "illegal gambling business" means:

        a gambling business which–

        (i)    is a violation of the law of a State or
               political subdivision in which it is
               conducted;

        (ii)   involves five or more persons who conduct,
               finance, manage, supervise, direct, or own
               all or part of such business; and

        (iii)  has been or remains in substantially
               continuous operation for a period in excess
               of thirty days or has a gross revenue of
               $2,000 in any single day.

18 U.S.C. § 1955(b)(1).  Additionally, the statute provides that

"'gambling' includes but is not limited to pool-selling,

bookmaking, maintaining slot machines, roulette wheels or dice

tables, and conducting lotteries, policy, bolita or numbers

games, or selling chances therein."  18 U.S.C. § 1955(b)(2).

        The jury found that the government proved all the

elements of Section 1955(b)(1) beyond a reasonable doubt.

Specifically, it found that the defendant, together with others,

3

conspired to (i) operate and operated an illegal gambling
business involving illegal card games at a location in Staten
Island, which operated in violation of New York Penal Law
Sections 225.05 and 20.00, (ii) which involved five or more
persons who conducted, financed, managed, supervised, directed
and owned all or part of the business and (iii) had a gross
revenue of at least $2,000 in any single day.

Nevertheless, the defendant argues that the Court must
enter a judgement of acquittal because the IGBA does not cover
poker as a matter of law.  The defendant argues that the
definition of "gambling" provided by Section 1955(b)(2)
constitutes a substantive and independent element that the
government must satisfy in addition to proving the elements
prescribed by Section 1955(b)(1).  In particular, the defendant
argues that the list of gambling activities in Section 1955(b)(2)
limits the scope of the IGBA only to gambling activities that are
both i) house-banked and ii) pure games of chance.  This argument
is not supported by relevant case law, the plain reading of the
statute, or its legislative history.  Furthermore, if the Court
were to conclude that Section 1955(b)(2) constitutes a separate
element of the IGBA, poker satisfies it because it falls under

the inclusive definition of "gambling" set forth in the text of Section 1955(b)(2).

II.   Section 1955(b)(2) Is Not a Substantive and Independent Element of the IGBA

   A.   Case Law and Statutory Construction Establish that Section 1955(b)(2) Is Not a Substantive and Independent Element of the IGBA

   The defendant argues that the definition of "gambling" provided by Section 1955(b)(2) constitutes a substantive and independent element of the IGBA that the government must satisfy in addition to proving the elements of Section 1955(b)(1).  The crux of the defendant's argument has been previously advanced and rejected by the Third Circuit.  In United States v. Atiyeh, 402 F.3d 354 (3d Cir. 2005), the defendant argued that the conduct for which he was convicted under the IGBA, becoming a custodian of funds that were wagered or to be wagered, while illegal under Pennsylvania law, was not "gambling" as defined by 18 U.S.C. § 1955(b)(2). The court noted:

        This argument is flawed.  The relevant
        definition for our purposes is that of an
        "illegal gambling business," provided for in 18
        U.S.C. § 1955(b)(1), not the definition of
        "gambling" provided for in § 1955(b)(2). The
        jury found that [the defendant] violated 18 Pa.
        Cons. Stat. § 5514(4), and therefore operated
        an "illegal gambling business" as defined by 18
        U.S.C. § 1955(b)(1).  We have held that the
        mere custodianship of gambling-related funds is
        sufficient to constitute a violation of 18

5

> U.S.C. § 1955, because such custodianship is
> considered to be "gambling" under state law
> even though it may not appear to fit within
> "gambling" as defined in § 1955(b)(2).

Id. at 372.

In addition, the statutory construction of the IGBA

supports the conclusion that Section 1955(b)(2) does not

constitute an independent substantive element.  Under Section

1955(b)(1)(i), an "'illegal gambling business' means a gambling

business which . . . is a violation of the law of a State or

political subdivision in which it is conducted."  Because the

statute is constructed in such a way that the meaning of the term

"gambling" is so closely tied to state law, it suggests that

Congress did not intend to establish an independent federal

definition for the term "gambling" separate and apart from its

meaning under state law.

Moreover, the broad and elastic language of Section

1955(b)(2) belies the argument that the section establishes an

independent federal definition of gambling.  Section 1955(b)(2)

contains a list of gambling activities that is prefaced with the

qualification, "includes but is not limited to."  The section

thus does not purport to offer a fixed definition, as the

defendant suggests.  Indeed, had Congress wished to establish a

federal definition of "gambling," it would have provided an

6

exhaustive list of prohibited activity or, alternatively, a precisely crafted definition of "gambling."  It did not.  When Congress stated that gambling under the IGBA "includes but is not limited to" particular activities, it meant just what it said: that it was offering a non-exhaustive list of examples of gambling, not establishing a stand-alone federal definition of gambling.  See Connecticut Nat'l Bank v. Germain, 503 U.S. 249, 253-54 (1992) ("We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there").  On this basis, the IGBA has historically been used to prosecute illegal gambling businesses that engaged in activities not enumerated in Section 1955(b)(2).  See, e.g., United States v. Reitano, 862 F.2d 982 (2d Cir. 1988) (rough-and-tumble blackjack);  United States v. Useni, 516 F.3d 634 (7th Cir. 2008)(bingo);  United States v Tucker, 638 F.2d 1292 (5th Cir. 1981)(blackjack); United States v. Shursen, 649 F.2d 1250 (8th Cir. 1981) (blackjack). Accordingly, the Court should reject the defendant's argument that Section 1955(b)(2) creates a substantive and independent element.

B.   The Legislative History Establishes that Section
     1955(b)(2) Is Not a Substantive and Independent
     Element of the IGBA

     The defendant's argument that Section 1955(b)(2)

constitutes a separate substantive element is also inconsistent

with the context in which the IGBA was enacted in 1970.  The

IGBA, part of the Organized Crime Control Act, was not crafted to

place a federal imprimatur on what activities constitute gambling

(a matter traditionally left to the states), but rather to

address Congress's finding that, where a state had outlawed a

particular form of gambling, "organized crime had developed

complex channels" to capitalize on the opportunity presented.

United States v. Sacco, 491 F.2d 995, 1000 (9th Cir. 1974)

(discussing legislative history).  The IGBA was "designed to aid

the enforcement of state law" where the state had identified the

gambling business as illegal while at the same time "exempt[ing]

from the federal statute the operators of gambling businesses

that are not contrary to a state's public policy on gambling."

United States v. Farris, 624 F.2d 890, 892, 895 (9th Cir. 1980).[1]

---

[1]   The fact that a state might determine that poker should not
be covered under its gambling laws supports the IGBA's purpose:
in any such state, the IGBA would not prohibit a gambling
activity permitted by the state.  The government is aware of only
one state court, in a decision that has not subsequently been
reversed on appeal, to have held that its gambling laws did not
cover poker.  That case is presently under review by the South
Carolina Supreme Court.  See Town of Mt. Pleasant v. Chimento, No.
2009-CP-10-001551 (S.C. Ct. App. Oct. 1, 2009).

8

Given this rationale, Congress had little interest in actually defining what constituted gambling (which explains its decision to reference state law), but significant interest in ensuring that the IGBA reached whatever form of gambling a state saw fit to ban.

The legislative history further suggests that Congress intended the IGBA to aid the enforcement of state law based on each state's policy determination of what constitutes illegal gambling. During his discussion of the IGBA, Senator Allott noted that "the purpose of the statute is simply to make the Federal Government a more effective member of the established State-Federal law enforcement partnership which has long been waging a common war on organized crime and illegal gambling." 116 Cong. Rec. 604 (daily ed. Jan. 21, 1970)(statement of Sen. Allott). Additionally, Senator Hruska was among many Senators who referenced President Nixon's April 23, 1969 message on organized crime during debate on the Senate floor. President Nixon characterized the legislation as giving "the Attorney General broad latitude to assist local and state government in cracking down on illegal gambling, the wellspring of organized crime's reservoir." 116 Cong. Rec. 601 (daily ed. Jan. 21, 1970)(statement of Sen. Hruska). Senator McClellan, who

introduced the bill, stated during discussion on the floor that
"[The IGBA] would give the Federal Government two new means to
aid the States in combating large-scale gambling."  116 Cong.
Rec. 591 (daily ed. Jan. 21, 1970) (statement of Sen. McClellan).
During a House Judiciary Committee hearing, Attorney General
Mitchell submitted a Department of Justice memorandum which
stressed that the IGBA "does not proscribe gambling which is
legitimate under state law, nor does it prohibit lotteries and
bingo games conducted for charitable purposes.  The federal
proposal will not interfere with a State's right to regulate the
conduct of citizens within its jurisdiction."  Mitchell, John.
Statement to the House, Subcommittee No. 5 of the Committee on the
Judiciary.  S.30 and Related Bills, Hearing, May 21, 1970 (170).

        Despite strong evidence that Congress intended the IGBA
to complement, not undermine, state gambling laws, the federal
definition of gambling proposed by the defendant would do exactly
that.  The defendant's proposed federal definition would exclude
certain categories of activities universally considered by the
states to constitute gambling.  Future IGBA cases would then turn
solely on a challenged activity's conformity with the federal,
rather than the state, definition of gambling, reducing the
IGBA's state law violation element to irrelevance.  Any statutory

10

interpretation that effectively reads a provision out of the statute, as the defendant's construction does, should be rejected.  See, e.g., Duncan v. Walker, 533 U.S. 167, 174 (2001) ("It is our duty to give effect, if possible, to every clause and word of a statute.") (internal citations and quotations omitted); United States v. Kozeny, 541 F.3d 166, 174 (2d Cir. 2008) ("When interpreting a statute, we are required . . . to avoid statutory interpretations that render provisions superfluous.") (internal citations and quotations omitted).  Aside from this legal infirmity, the defendant's proposed construction is also highly implausible, since Congress could not have intended a statute designed to complement state gambling laws and assist the states in enforcing those laws to simply ignore gambling policy determinations made by the states.

Moreover, a federal definition of gambling would require the courts to determine which types of gambling outlawed by the states were permitted under the statute and which were not.  This would create an extraordinarily complex and unpredictable approach to the statute that is inimical to the IGBA's structure and underlying purpose to align with state law determinations as to what type of gambling is lawful.

11

Nowhere in the IGBA's legislative history is there evidence that Congress intended to provide an independent federal definition of gambling. In fact, there was repeated emphasis in Congress on the role reserved to the states to regulate gambling activities. For this reason too, the Court should reject the defendant's proposed interpretation.

III.     Even If Section 1955(b)(2) Were Deemed to Establish an Independent Substantive Element, the Government Has Satisfied That Element Because Poker Constitutes Gambling Under Section 1955(b)(2)

Even if Section 1955(b)(2) of the IGBA were found to establish a substantive and independent element, the government has satisfied that element because poker, which the defendant has admitted to be the game that took place at his club, constitutes "gambling" under Section 1955(b)(2). Through a strained and erroneous application of *ejusdem generis,* the defendant argues that Section 1955(b)(2) assigns "gambling" a narrow and arbitrarily conceived meaning that excludes poker. Specifically, the defendant argues that poker is dissimilar from the activities enumerated in Section 1955(b)(2) because it not a game of pure chance and is not house-banked. The defendant's argument fails, however, because his application of *ejusdem generis* both strips the general term "gambling" of its obvious meaning and defeats the IGBA's clear legislative purpose to prevent organized crime

12

from raising revenue through illegal gambling schemes.  Both the IGBA statutory scheme, including the language of Section 1955(b)(2) itself, and the IGBA's underlying policy conclusively show that Section 1955(b)(2) encompasses poker, one of today's most popular gambling activities and a significant target for exploitation by organized crime.

> A.   Poker Constitutes "Gambling" Under Section 1955(b)(2) According to the Most Widely Understood and Doctrinally Sound Interpretation of that Term

Section 1955(b)(2) defines "gambling" broadly.  It reads, "'[G]ambling' includes *but is not limited to,* pool-selling, bookmaking, maintaining slot machines, roulette wheels or dice tables, and conducting lotteries, policy, bolita or numbers games, or selling chances therein."  18 U.S.C. 1955(b)(2) (emphasis added).  Although poker is not included among the section's illustrative list of gambling activities, both the widely understood term "gambling" and the elastic "but is not limited to" clause strongly suggest that poker, which has been almost universally considered a form of gambling since its inception, falls well within the ambit of the section.  See id.

Throughout its history, poker has been commonly understood to constitute gambling.  The game appeared in roughly its modern form during the early nineteenth century in New

Orleans, apparently as a derivative of the French game *poque*.
James McManus, *Cowboys Full: The Story of Poker* 51 (2009).  A
wave of anti-gambling laws was passed by state legislatures
across the country at around the same time, and these laws
invariably prohibited poker along with other gambling activities.
Id. at 83-84. From the outset, those individuals who played poker
in saloons were called "gamblers," and poker is described almost
unfailingly as "gambling" in a variety of contexts in reported
cases dating back to the 1800s.[2]

 Poker's historical perception as a form of gambling
persists today.  The Merriam-Webster dictionary defines "poker,"
in relevant part, as "any of several card games in which a player
*bets* that the value of his or her hand is greater than that of
the hands held by others . . . "  Merriam-Webster Online
Dictionary (July 27, 2012), http://www.merriam-
webster.com/dictionary/poker?show=1&t=1343184416 (emphasis
added).  Kenny Rogers's popular 1978 song about poker, which
includes lyrics about "when to hold 'em" and "when to fold 'em,"

---

[2] See, e.g., Utsler v. Territory, 10 Okla. 463 (1900) ("The
witness Fisher also testified that he saw gambling carried on in
the room with cards, being known as 'stud poker,' and he also
testified that liquor was sold in the same room."); In re
Selling's Estate, 17 N.Y. St. Rep. 833 (1888) ("The proof
submitted by the petitioner also shows the respondent Joseph
Selling to be a man of utterly worthless and irresponsible
character; that he is a professional gambler, know[n] as 'Poker
Joe....' ").

is entitled "The Gambler."  Forty-nine of the fifty states have either legislatively[3] or judicially[4] classified poker as a form of gambling; in the remaining state, South Carolina, the question is under review in the state supreme court.  Simply put, the prevailing view on poker is —- and has always been —- that it constitutes a form of gambling.  To exclude poker from the ambit

---

[3]     See, e.g., Ark. Code § 5-66-112 (prohibiting card games, including "poker"), Cal. Pen. Code § 337j(e)(1) (including poker in definition of controlled game, which is unlawful to operate without a license); Conn. Gen Stat. § 53-278a(2) (including poker in definition of gambling); Fla. Stat. § 849.085(2)(a) (gambling on poker not a crime when played for "penny ante"); Idaho Const. Art III § 20(2) (state may not permit casino gambling, including poker); Idaho Code § 18-3801 (including poker as gambling); Iowa Code § 99B.11(3) (tournament exemption to gambling statute does not apply to poker); Ohio Revised Code §§ 2915.01(D) and 2915.02(A)(2) (defining gambling to include "poker, craps [or] roulette"); Okla. Stat. 21 § 941 (poker included in definition of gambling); Or. Rev. Stat. § 167.117(4) (poker a proscribed "casino game"); Tenn. Code Ann. §§ 39-17-501, Sentencing Commission Comments (defining gambling to include "poker"); Wis. Const. Art IV, § 24(6)(c)(poker is not a exempt from state prohibition on gambling).

[4]     See, e.g., Garrett v. Alabama, 963 So. 2d 700 (Ala. Crim App. 2007) (poker covered by state gambling statute); State v. Duci, 151 Ariz. 263 (1986) (same); People v. Mitchell, 444 N.E. 2d 1153, 1155 (Ill. App. Ct. 1983) (same); State v. Schlein, 253 Kan. 205, 305 (1993) (same); Emerson v. Townsend, 73 Md. 224 (1890) (money loaned for poker was loaned for "gambling"); People v. Turner, 629 N.Y.S. 2d 661, 662 (N.Y. Crim. Ct. 1995) (poker covered by state gambling statute); Joker Club LLC v. Hardid, 643 S.E. 2d 626, 630-31 (N.C. Ct. App. 2007) (same); Garono v. State, 524 N.E.2d 496, 500 (Ohio 1988) (same); Commonwealth v. Dent, 992 A.2d 190, 196 (Pa. Super. 2010) (same); In re Advisory Opinion to the Governor, 856 A.2d 320, 328-329 (R.I. 2004) (same); State ex rel Schillberg v. Barnet, 488 P.2d 255, 258 (Wash. 1971) (same).

15

of "gambling" under Section 1955(b)(2), therefore, contradicts the widely understood and plain meaning of that term.

In a bid to avoid the unavoidable conclusion that poker constitutes a form of "gambling," the defendant seeks to arbitrarily narrow the scope of "gambling" through a strained application of the canon of *ejusdem generis*.  This canon, he argues, limits the scope of general statutory terms accompanied by illustrative lists to a common attribute shared by the members of that list.  He then identifies a pair of common attributes that, he contends, limit the scope of the word "gambling" in Section 1955(b)(2): first, that the games in the list are "house-banked," and second, that the games in the list are "games of chance."  The defendant is wrong.

As an initial matter, this Court need not reach the canon of *ejusdem generis*, because the word "gambling" is not ambiguous enough to invoke the canons of statutory interpretation, and it is beyond dispute that poker is widely understood to be a gambling activity.  See <u>United States v. Turkette</u>, 452 U.S. 576, 581 (1981) ("The rule of *ejusdem generis* is no more than an aid to construction and comes into play only when there is some uncertainty as to the meaning of a particular clause in a statute"); <u>see also</u> <u>United States v. Powell</u>, 423 U.S.

16

87, 91 (1975); Gooch v. United States, 297 U.S. 124, 128 (1936);

City of New York v. Permanent Mission of India to United Nations,

618 F.3d 172, 184 (2d Cir. 2010) (rejecting proposed

interpretation under *ejusdem generis* where that interpretation

would "risk reading judicial limits into a term Congress seems

deliberately to have sought to leave open-ended . . . ").

However, if this Court does reach the canon of *ejusdem*

*generis*, the defendant's proposed application of that canon

suffers from several defects. First, his construction strips the

general term "gambling" of its intrinsic and obvious meaning, and

an application of *ejusdem generis* may not "render general terms

meaningless." United States v. Alpers, 338 U.S. 680, 683 (1950);

see also Christopher v. Beecham Corp., 132 S.Ct. 2156, 2171

(2012) (quoting Alpers); Ferrara & DiMercurio, Inc. v. St. Paul

Mercury Ins. Co., 169 F.3d 43, 52 (1st Cir. 1999) (same). It is

a "cardinal principle of statutory construction that a statute

ought, upon the whole, to be so construed that, if it can be

prevented, no clause, sentence, or word shall be superfluous,

void, or insignificant." TRW Inc. v. Andrews, 534 U.S. 19, 31

(2001). Under the defendant's proposed construction, the term

"gambling" -- which denotes a historically established and widely

accepted meaning that Congress undoubtedly understood when it

17

enacted the IGBA —- would not mean "gambling" at all.  Instead, it would be limited to an arbitrarily defined subset of gambling activities that, conveniently for the defendant, excludes the gambling activity that resulted in his conviction.

If Congress had intended to restrict the set of gambling activities as the defendant suggests, it could easily have written the statute to clearly and precisely effectuate this intent.  See Ali v. Fed. Bureau of Prisons, 552 U.S. 214, 225-26 (2008) (declining to adopt more limited statutory interpretation under *ejusdem generis* where broader interpretation was also available); Turkette, 452 U.S. at 581 (declining to adopt element of proposed statutory interpretation under *ejusdem generis* where Congress could easily have specified that element by including additional word in the statute's text).  Congress did not do so and instead chose to anchor Section 1955(b)(2) to the broad and widely understood term "gambling."   The language of Section 1955(b)(2), therefore, strongly indicates that Congress intended to adopt the plain meaning of that term, not the artificially constrained meaning that the defendant proposes.  "[T]here is no contextual basis for adopting a narrower than normal meaning here." City of New York, 618 F.3d at 184.

18

Second, the defendant's proposed application of *ejusdem generis* identifies two arbitrary and very specific common attributes that, he argues, restrict the meaning of the term "gambling."  Yet he fails to offer a sufficient reason for why this Court should adopt these two attributes instead of an equally plausible and broader alternative –- that each of the enumerated games involves wagers of money.  <u>See</u> <u>Ali</u>, 552 U.S. at 225-26 (declining to adopt a narrower interpretation of enumerated items where broader interpretation comported equally well with statute at large).  This broader common attribute both identifies a meaningful characteristic common to the list and preserves the prevailing meaning of the term "gambling."  Because the defendant has failed to offer a persuasive reason to adopt his narrow application of *ejusdem generis,* this Court should reject his arbitrary definition of a "gambling" activity under Section 1955(b)(2) as a house-banked game of chance.  <u>See</u> <u>id.</u>[5]

---

[5]    Notably, the IGBA already contains an explicit carve-out section. Section (e) of the statute reads, in relevant part, "This section shall not apply to any bingo game, lottery, or similar game of chance conducted by [a tax-exempt organization] . . . ." 18 U.S.C. § 1955(e). If Congress had intended to exclude certain other activities from the IGBA's reach, which the defendant's proposed construction implies, it could have easily done so by specifying them in an explicit carve-out section rather than leaving them unnamed for the courts to somehow divine.

B.    A Narrow Reading of Section 1955(b)(2) that
      Arbitrarily Excludes Poker Would Frustrate the
      Underlying Legislative Purpose of the IGBA to
      Combat the Involvement of Organized Crime in
      Illegal Gambling Enterprises

Congress enacted the IGBA in 1970 for a simple yet
important purpose: to deprive organized crime of the substantial
revenue it raised through illegal gambling businesses to fund its
other criminal activities.  In its 1967 report to the President,
the Commission on Law Enforcement and Administration of Justice
noted widespread agreement among law enforcement officials that
"gambling is the greatest source of revenue for organized crime."
*The Challenge of Crime in a Free Society: A Report by the
President's Commission on Law Enforcement and Administration of
Justice* (1967), 187.  The Commission estimated that organized
crime realized profits of six or seven billion dollars each year
through its illegal gambling operations.  Id. at 189.  To arrest
the flow of such significant amounts of money into the hands of
organized crime's leaders, Congress enacted the IGBA as a means
of augmenting local and state law enforcement with "the
expertise, and the manpower, and the full resources of the
Federal Bureau of Investigation, and other agencies of the
Federal Government."  115 Cong. Rec. 10736 (1969).  The defendant
argues that Congress intended the IGBA to reach only a more

20

limited subset of gambling activities -- house-banked games and games of chance, not poker.  This position, however, relies entirely on speculation and finds no credible basis in the IGBA's legislative history.

Indeed, an abundance of evidence drawn from the legislative record shows that Congress's intent in enacting the IGBA was to combat organized crime by denying it one of its principal revenue sources.  In its report accompanying the enacted law, Congress found that:

> (1) organized crime in the United States is a highly sophisticated, diversified, and widespread activity that annually drains billions of dollars from America's economy by unlawful conduct and the illegal use of force, fraud, and corruption; (2) organized crime derives a major portion of its power through money obtained from such illegal endeavors as syndicated gambling, loan sharking, the theft and fencing of property, the importation and distribution of narcotics and other dangerous drugs, and other forms of social exploitation; (3) this money and power are increasingly used to infiltrate and corrupt legitimate business and labor unions and to subvert and corrupt our democratic processes; (4) organized crime activities in the United States weaken the stability of the Nation's economic system, harm innocent investors and competing organizations, interfere with free competition, seriously burden interstate and foreign commerce, threaten the domestic security, and undermine the general welfare of the Nation and its citizens; . . . United States v. Aquino, 336 F. Supp. 737, 739 (E.D. Mich. 1972) (quoting Pub.L. 91-452, Oct. 15, 1970, 84 Stat. 922).

Nowhere in these findings did Congress express an intent to exclude poker or any other commonly understood gambling activity from the IGBA's scope.  Nor did Congress articulate an objective that was any more specific than a broad campaign to curtail illegal gambling businesses operated by organized crime syndicates.

Other evidence from the IGBA's legislative history validates this understanding of Congress's intent in enacting the law.  Senator Allott, who spoke on the Senate floor in favor of the bill, noted that the Organized Crime Control Act, which included the IGBA, was "the result of a concerted effort to stop the spread of organized crime . . . . One title [i.e., the IGBA] stands out because its proper enforcement could strike a crippling blow to its major source of revenue—illegal gambling." 116 Cong. Rec. 603 (1970).  Courts that have reviewed the IGBA's legislative history have arrived at the same understanding.  See, e.g., Sacco, 491 F.2d at 998 ("The [Organized Crime Control Act] was aimed at curtailing syndicated gambling, the lifeline of organized crime, which provides billions of dollars each year to oil its diversified machinery").  The legislative history makes clear that Congress's central intent in enacting the IGBA was to deprive organized crime of proceeds derived from *any* illegal

gambling business.  To limit the IGBA's scope only to certain arbitrary categories of gambling activities, as the defendant proposes, would frustrate the statute's purpose.

Moreover, that organized crime's involvement in illegal poker games extends beyond, as the defendant self-servingly puts it, "running the occasional poker game" is beyond dispute.  Def. Mem. Of Law in Support of His Rule 29 Motion ("Def. Rule 29 Motion"), at p. 16.  In recent years, the federal government has prosecuted a significant number of organized crime cases involving illegal poker games and other serious criminal offenses.  Some examples include:

- In June 2012, twenty individuals, including alleged associates of the Gambino crime family, were charged in the District of Connecticut with, among other federal offenses, operating "illegal card gambling clubs."  See U.S. Attorney's Office District of Connecticut Press Release dated June 13, 2012, attached hereto as Ex. A.

- In May 2012, thirteen individuals affiliated with the Genovese crime family and its associated Lascala Crew were indicted on racketeering charges, in the District of New Jersey for among other things, operating "social clubs in northern New Jersey and elsewhere" where members of the Lascala crew "profit through card games and other illegal games of chance."  See U.S. Attorney's Office for the District of New Jersey Press Release dated May 22, 2012, attached hereto as Ex. B.[6]

---

[6]    Although not specified in Exhs. A and B, the government confirmed that the cards games referred to in these exhibits are poker.

23

- In April 2012, four members of the Gambino crime family pled guilty to various gambling offenses in the Southern District of New York, including "running . . . various regular, high-stakes poker games." The same individuals also pled guilty to a number of other offenses involving narcotics trafficking, firearms, extortions, and assaults. See U.S. Attorney's Office for the Southern District of New York Press Release dated April 26, 2012, attached hereto as Ex. C.

- In January 2011, fifteen individuals, including one alleged member and several alleged associates of the Gambino crime family, were charged in the District of New Jersey and the Eastern District of New York with a variety of federal offenses, including racketeering, extortionate collection of credit, and illegal gambling. Specifically, one of the defendants in that case, Richard Dehmer, an alleged associate of the Genovese crime family, was charged with operating an illegal poker club in New Jersey. See District of New Jersey/Eastern District of New York joint press release dated January 20, 2011, attached hereto as Ex. D. Three individuals who helped to manage that club pled guilty to IGBA charges in October 2011. See District of New Jersey Press Release dated October 4, 2011, attached hereto as Ex. E.

- In April 2010, fourteen alleged members and associates of the Gambino crime family were charged in the Southern District of New York with, among other federal offenses, racketeering, murder, sex trafficking, jury tampering, extortion, assault, narcotics trafficking, and illegal gambling. Specifically, seven of the defendants in that case were charged under the IGBA with operating illegal "weekly, high-stakes poker games." It was alleged that those defendants made prostitutes available to the gamblers who participated in those games. See U.S. Attorney's Office for the Southern District of New York Press Release dated April 20, 2012, attached hereto as Ex. F.

24

> • In March 2008, Michael Uvino, a captain in the
> Colombo crime family, and several other Colombo
> family associates were charged in the Eastern
> District of New York with, among other federal
> offenses, kidnapping and assaulting two
> individuals they believed had organized a robbery
> of an illegal poker club controlled by the Colombo
> family. <u>See</u> U.S. Attorney's Office for the
> Eastern District of New York Press Release dated
> March 27, 2008, attached hereto as Ex. G.

The defendant argues that the silence in the legislative record regarding the status of poker as a gambling activity under the IGBA means that Congress intended to exclude poker from the IGBA's reach. The defendant's speculative position -- one that relies on a remote and unsubstantiated inference -- both unduly constrains the IGBA's policy objective of combatting organized crime and ignores the fact that organized crime syndicates operate illegal poker games. Adopting the defendant's reading of the statute would practically invite organized crime syndicates to run illegal poker games with impunity under the IGBA, defeating the IGBA's policy objective.

A more plausible explanation for the omission of poker from the list of activities in Section 1955(b)(2) and the silence in the legislative history regarding poker's status as a gambling activity is that poker was far less popular in 1970, when the IGBA was enacted, than it is today. Poker's surge in popularity, often called the "Poker Boom," is a relatively recent phenomenon

25

that reached its apex between 2003 and 2006.  Anthony Holden,
*Bigger Deal: A Year Inside the Poker Boom* (2007), 1.  Prior to
the Poker Boom, poker suffered from a largely negative
reputation. "For most of the twentieth century, to those without
their own home games, poker remained largely the preserve of a
select few in the movies, usually westerns, dubious characters
who were probably out to cheat you -— or would draw a gun if you
won their money." <u>Id.</u> at 10.  Although Nevada's legalization of
gambling in the 1930s began to reverse the public's negative
perception of poker, this perception largely persisted until the
Poker Boom.  <u>Id.</u>

The release of the popular film *Rounders* in 1998
allowed poker to garner public exposure and interest, but by far
the most important catalyst for the "Poker Boom" was the
emergence of the Internet, which allowed for online poker-
playing, and cable television, which frequently broadcast poker
tournaments.  <u>Id.</u> at 1, 10. Both forms of media facilitated the
explosion of poker's popularity within a matter of years.  The
World Series of Poker, perhaps the most prestigious poker
tournament in the United States, provides a useful proxy for the
rapid growth in poker's popularity.  When the tournament began in
1978, 42 players participated; by 1988, this number had grown to
167.  <u>Id.</u> at 1.  In 2006, by contrast, 8,773 players entered the

26

"main event" alone, and more than 44,500 players participated in the tournament at large.  Id.  Poker has shed much of its notorious reputation and is now considered chic and fashionable. Id. at 11.  Indeed, many Hollywood stars are known to play poker regularly.  Id.  Experts estimate that $100 million are wagered through online poker websites every day. Id. at 10.

Poker's historical development provides an explanation for its omission from Section 1955(b)(2) that is more plausible than that offered by the defendant.  When Congress enacted the IGBA in 1970, organized crime derived its illegal gambling revenue primarily through gambling activities involving lotteries or wagering on the outcomes of horse races and sporting events. For that reason, Congress enumerated the gambling activities that presented law enforcement with its most pressing challenges related to organized crime at that time.  Poker, a much lesser known game than some of its gambling counterparts, simply did not rate among these challenges when Congress drafted and enacted the law.  Congress, however, could not have been so short-sighted as to limit the scope of Section 1955(b)(2) to only gambling activities that organized crimes syndicates were principally associated with in 1970.  Such a construction of the IGBA would deprive law enforcement officials of the flexibility needed to combat evolving illegal gambling schemes established by organized

27

crime syndicates, defeating the statute's clear and well-established legislative purpose.  See Powell, 423 U.S. at 91 (declining to adopt a narrow interpretation of a statute where doing so would not comport with Congress's purpose in enacting the statute); United States v. Gooch, 297 U.S. 124, 128 (1936)(holding that *ejusdem generis* "may not be used to defeat the obvious purpose of legislation").

The surge in poker's popularity is notable because it illustrates the lucrative opportunity that illegal poker businesses now present to organized crime syndicates and other criminal actors.  The defendant himself was convicted of exploiting precisely this opportunity, not merely of operating an innocuous kitchen table game.[7]  The IGBA's legislative history, along with its text and structure, clearly show that Congress intended the statute to target illegal gambling businesses in large part because organized crime syndicates frequently operate

---

[7]    The defendant suggests that "poker" is not included in the definition of gambling because "President Nixon, himself an accomplished poker player who surely frequented such games over the years, probably did not intend to criminalize his own conduct when he signed IGBA into law."  Def. Rule 29 Motion, at p. 4. The defendant's statement is misleading.  The IGBA does not criminalize the playing of poker per se, and under no circumstances would President Nixon's participation in friendly poker games violate federal law.  Excluding poker from the ambit of gambling under Section 1955(b)(2) based on a misplaced concern about punishing casual players, which the IGBA does not do, would frustrate the statute's purpose in a misguided attempted to redress a baseless fear.

such businesses to fund their criminal activities.  Excluding poker from the ambit of "gambling" under Section 1955(b)(2) would directly subvert this objective.

C.   The Defendant's Proposed Restriction of Gambling Activities to House-Banked Games of Chance Fails to Distinguish Poker From Other Undisputed Gambling Activities

The defendant's narrow and arbitrary construction of Section 1955(b)(2) fails for an additional reason.  The defendant's argument that the enumerated games are house-banked games of chance, while poker is a game of skill in which participants compete against each other rather than the house, offers no relevant distinction at all.  While perhaps more sophisticated than certain of the games enumerated in Section 1955(b)(2), poker is a game of chance, and it offers the house financial opportunities that are every bit as lucrative as those presented by other gambling activities.

To compare the degree of luck that controls outcomes in poker games, where randomness is the game's driving element, to the degree of luck that controls outcomes in golf, where randomness operates only at the game's periphery, defies reasonableness and common sense.  Randomness resides at the very core of poker.  As such, a "good" poker player is, above all else, one who consistently makes mathematically optimal decisions under individual circumstances.  In this way, a "good" poker

player is akin to a "good" player in, for instance, blackjack —— which the defendant would, and must, consider to be a gambling activity under the statute —— who minimizes randomness simply by knowing when it is mathematically favorable to "hit," "stay," and so forth.  Although the mathematically optimal strategy in poker is undoubtedly more complex than it is in blackjack, "good" play in both games consists of knowing the odds and playing them. Fortuitous events might influence outcomes in golf at the margins, but a golfer cannot minimize randomness by following a formal mathematical strategy designed for that purpose.

Furthermore, sports betting, one of the gambling activities enumerated by Section 1955(b)(2), is widely considered to require a significant amount of skill to be conducted successfully.  Betting on the outcome of sporting events involves "substantial (not 'slight') skill," including "the exercise of [a] bettor's judgment in trying to ... figure [out] the point spreads."  Office of the Attorney General of the State of New York, *Formal Opinion No. 84-F1, N.Y. Op. Atty. Gen 11* (1984). Sports bettors have every opportunity to employ superior knowledge of the games, teams and players involved in order to exploit odds that do not reflect the true likelihoods of the possible outcomes. Indeed, academics who have argued that poker should not be treated as a form of illegal gambling on the

grounds that it is a "game of skill" make the same argument regarding sports betting.  See*, *e.g.*, Scott Van Voorhis, "*Profs Back Online Poker,"* Boston Herald, October 22, 2007 (available at 2007 WLNR 20766706)("Like [Professor Charles] Nesson, [Professor Alan] Dershowitz contends that, under the same 'game of skill' theory, online sports betting should be legalized. . . . Dershowitz said, 'It is ridiculous to call either poker or sports betting a game of chance.' "). Ultimately, the outcome of the bets that poker players make on the cards, just like the outcome of the bets placed on sporting events, is principally governed by events beyond the bettor's control-- i.e., chance.

Even expert poker players recognize the critical role that luck plays in the game.  For instance, Phil Gordon, a professional poker player, has observed, "Change ten river cards [i.e., the final card dealt in any Texas hold'em hand] in any poker player's tournament career, and I would bet that they would be a losing tournament player for their career."  McManus at 342. Dan Harrington, a prominent and accomplished expert poker player, has said, "The volatility in [no-limit Texas hold'em] tournaments is out of sight . . . Sure, you see some names repeating as winners.  They are truly great players.  But the problem is, there are lots of other truly great players you haven't seen at all.  And it's not because they are paying badly.  It's the

31

variance.  *You need to be extremely lucky*."  <u>Id.</u> at 343 (emphasis added).[8]

Similarly, the defendant's expert, Dr. Heeb, has acknowledged the role that luck plays in poker.  After defeating Johnny Chan, a world-renowned poker player, at the 2002 World Series of Poker, Dr. Heeb was asked whether he had used game theory against Chan.  He responded, "Not really . . . I had good cards," and further, "I didn't know when [Chan] was bluffing." Transcript of Proceedings, July 6, 2012, at p. 65. Interestingly, when the government questioned Dr. Heeb about these comments during the Daubert hearing, Dr. Heeb had no recollection of having made them.  <u>See</u> <u>id.</u>

Moreover, the defendant's proposed distinction of "house-banked" games is without merit.  The defendant argues that poker games, which generate revenue through a house-collected rake rather than unfavorably weighted odds, are less financially lucrative than certain other gambling activities.  Both common sense and readily available examples belie this argument. A rake is functionally equivalent to the house's mathematical advantage

---

[8]    The defendant mistakenly describes his expert's testimony as "uncontested." To the extent that this Court is inclined to decide the defendant's motion on the basis of the testimony offered by the defendant's expert, the government requests an opportunity to adequately respond to this testimony, possibly by calling its own rebuttal expert.

in other gambling activities.  Both systems represent different methods by which the house collects revenue.  The defendant himself found poker to be financially lucrative enough to operate illegal games at his warehouse. He finds himself in prestigious company: Foxwoods Resort Casino in Connecticut, one of the largest casinos in the world, prominently advertises its poker room on its web page, where it announces that its "dealers keep the action going 24 hours a day" in "the East Coast's largest poker room." <u>See</u> (http://www.foxwoods.com/pokerpage.aspx).  That organized crime syndicates have also found it profitable to operate illegal poker games speaks for itself.  <u>See</u> Exs. A-G. Poker games, regardless of whether they are "house-banked," offer financial opportunities that are just as lucrative as those presented to a potential house by any other gambling activity.

In short, the defendant's proposed limitation of gambling activities under Section 1955(b)(2) to house-banked games of chance either includes poker, a highly financially lucrative game of chance, and is therefore moot, or is simply meritless.  In either case, this Court should accord no weight to the statutory construction offered by the defendant.

D.   The Defendant Cannot Avail Himself of the Rule of
     Lenity

The defendant also argues that his conviction should
be vacated because the rule of lenity requires a penal statute
that admits of multiple possible interpretations to be construed
as favorably toward a defendant as possible.  The rule of lenity,
however, cannot avail the defendant here because, as set forth
above, the IGBA's structure and legislative purpose conclusively
dispels any ambiguity present within Section 1955(b)(2).  "[T]he
rule of lenity only applies if, after considering text,
structure, history, and purpose, there remains a grievous
ambiguity or uncertainty in the statute." Barber v. Thomas, 130
S.Ct. 2499, 2508 (2010) (internal quotations omitted).  "[W]hile
penal statutes are narrowly construed, this does not require
rejection of that sense of the words which best harmonizes with
the context and end in view." Gooch, 297 U.S. at 128.  The rule
of lenity may be invoked only "when [a court is] uncertain about
the statute's meaning" and is "not to be used in complete
disregard of the purpose of the legislature." United States v.
Culbert, 435 U.S. 371, 379 (1978) (internal quotations omitted).
As established by the foregoing discussion, inspection of the
IGBA's statutory construction and legislative history resolves
any ambiguity present within the plain text of Section

34

1955(b)(2), even assuming that such ambiguity exists (it does not).  Because this inspection conclusively shows that poker constitutes "gambling" under Section 1955(b)(2), no reasonable alternative interpretation exists that would permit the defendant to challenge his conviction under the rule of lenity.

CONCLUSION

For the reasons set forth above, the defendant's motion for a judgment of acquittal should be denied.

Dated: Brooklyn, New York
       July 27, 2012

                              LORETTA E. LYNCH
                              United States Attorney
                              Eastern District of New York


                    By:    _____/s/_____
                           Nathan Reilly
                           Marisa Megur Seifan[9]
                           Assistant U.S. Attorneys
                           (718) 254-6196/6008

---

[9]   The government would like to recognize and thank law student interns Amanda El-Dakhakhni and Andrew Trombly for their hard work and substantial contributions to the writing of this brief.

36